**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OLD BETH II, LLC, | Civil Action No. _____ |
| Plaintiff, | |
| v. | **NOTICE OF REMOVAL** |
| | **(Diversity)** |
| UIC, INC., a/k/a UNITED INSURANCE CONSULTANTS, INC., JOSEPH PEREZ, | |
| Defendants. | |

TO:     Clerk,
          United States District Court
          Eastern District of New York
          225 Cadman Plaza East
          Brooklyn, NY 11201

          Stephen Faraci, Sr., Esq.
          *Attorney for Plaintiff*,
          Old Beth II, LLC
          444 Madison Avenue, 4th Floor
          New York, NY 10022

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendants UIC, Inc. a/k/a United Insurance Consultants, Inc. ("UIC") and Joseph Perez ("Mr. Perez"), by and through its counsel, hereby gives notice of the removal to this Court of a civil action originally filed as *Old Beth II, LLC v. UIC, Inc. a/k/a United Insurance Consultants, Inc., Joseph Perez*, Index No. 600542/2023, in the Supreme Court of the State of New York, County of Nassau. In support of this Notice of Removal, Defendants state as follows:

        1.        On January 10, 2023, Plaintiff Old Beth II, LLC ("Old Beth") electronically filed a Summons and Complaint in the Supreme Court of the State of New York, County of Nassau, and purchased Index Number 600542/2023. Plaintiff's Verified Complaint named UIC and Mr.

Perez as Defendants. Plaintiff's Verified Complaint generally sounds in breach of contract, negligence, and fraud. <u>See</u> Summons and Complaint attached hereto as **Exhibit A**.

2.      On January 23, 2023, UIC was served with a copy of the Summons and Verified Complaint. A true and correct copy of all process, pleadings and orders served on UIC is attached hereto as **Exhibit A**.

3.      On February 1, 2023, Mr. Perez was served with a copy of the Summons and Verified Complaint. A true and correct copy all process, pleadings and orders served on Mr. Perez is attached hereto as **Exhibit B**.

4.      This Notice of Removal is timely filed, within thirty (30) days of both defendants' receipt of the Summons and Verified Complaint, pursuant to 28 U.S.C. § 1446(b) and the Federal Rules of Civil Procedure.

5.      Removal from the Supreme Court of the State of New York, County of Nassau, is proper under 28 U.S.C. § 1441(a) and (b), which authorizes the removal of any civil action of which the District Courts of the United States have original jurisdiction and "if none of the parties in interest properly joined and served as a defendant is a citizen of the state in which such action is brought." As set forth below, both defendants are citizens of the State of New Jersey.

6.      Removal from the Supreme Court of the State of New York, County of Nassau, is also proper under 28 U.S.C. § 1446 (c)(2), which allows a defendant to assert an amount in controversy in its notice of removal if the initial pleading seeks a money judgment and the state practice either precludes a plaintiff from demanding a specific sum or permits a plaintiff to recover damages in excess of the amount demanded.

7.    This Court has original jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332 insofar as the parties are citizens of different states and the matter in controversy exceeds $75,000.00.

8.    Plaintiff is a limited liability company duly organized and existing under and by virtue of the laws of the State of New York, with its only assets and real property located at 501 Winding Road, Old Bethpage, New York 11804.  See **Exhibit A**, ¶¶3, 10.  For the purposes of establishing diversity jurisdiction, "a limited liability company is a citizen of each state in which its individual members are citizens."  United States Liab. Ins. Co. v. M Remodeling Corp., 444 F. Supp. 3d 408, 409 (E.D.N.Y. 2020).

9.    Upon information and belief, Old Beth II, LLC is a citizen of the state of New York.  Pursuant to Local Civil Rule 81.1, the specific identify of the members of plaintiff Old Beth II, LLC are unknown to defendants, however, counsel for Plaintiff has informed defendants' counsel that none of the members of Old Beth II, LLC are residents or citizens of the state of New Jersey and that plaintiff would not oppose removal to this Court on the basis of diversity jurisdiction.

10.    Pursuant to Local Civil Rule 81.1, UIC is a foreign corporation organized under the laws of the State of New Jersey, and which maintains a principal place of business located at 1 Park Way, Upper Saddle River, New Jersey 07458. Accordingly, UIC is a citizen of New Jersey.

11.    Pursuant to Local Civil Rule 81.1, Mr. Perez is an individual who did and does reside in the State of New Jersey with an address located in Jersey City, New Jersey. Accordingly, Mr. Perez, is a citizen of New Jersey.

12. Accordingly, there is complete diversity of citizenship between the parties as defendants are citizens of the state of New Jersey and plaintiff is a citizen of New York or a State other than New Jersey.

13. Plaintiff's Verified Complaint contains allegations of breach of contract, *inter alia*, arising out of an Engagement Letter and contract between the parties whereby Plaintiff alleges that UIC and Mr. Perez failed to procure liability insurance coverage for Plaintiff's real property located in the state of New York. <u>See</u> **Exhibit A**, ¶¶12-13, 49-53.

14. Plaintiff alleges that Defendant's failure to obtain insurance coverage for its property was discovered on or about July 27, 2020, when Plaintiff was named as a defendant in an environmental-contamination tort lawsuit filed in the Supreme Court of the State of New York, County of Nassau, styled *Village of Farmingdale v. ALJO-GEFA Precision Manufacturing, LLC, et al.*, Index No. 607613/2020. <u>See</u> **Exhibit A**, ¶42. Therein, it is alleged that Plaintiff and other parties are responsible for contamination of the Village of Farmingdale's drinking water. The Village of Farmingdale seeks damages against Plaintiff and other parties including, *inter alia*, compensatory damages in the amount of $50,000,000 on each of the First, Second, and Third Causes of Action, and punitive damages in the amount of $100,000,000 on each of the First, Second, and Third Causes of Action. <u>See</u> Complaint in the Underlying Action identified by Plaintiff attached hereto as **Exhibit C**.

15. Plaintiff alleges that UIC and Mr. Perez's failure to procure insurance coverage for its property "leaves Old Beth uncovered for the liabilities associated with the Underlying Action including costs, expenses, attorneys' fees, and potential damages stemming from the Underlying Action that otherwise would have been covered had Defendants not acted

intentionally, grossly and recklessly in failing to procure essential insurance coverage. It is these damages Old Beth seeks to recover through this instant action." See **Exhibit A**, ¶44.

16.     Plaintiff seeks damages "in an amount to be determined at trial, but not less than all fees, costs, including attorneys' fees and costs, penalties, settlement payment(s), or judgment incurred as a result of the Underlying Action, plus interest thereon at the legal rate, as well as all costs incurred by Old Beth in presenting and prosecuting the claims asserted herein, including reasonable attorneys' fees and costs, and such other and further relief as the Court deems just and proper." See **Exhibit A**, ¶55.

17.     Plaintiff further brings claims sounding in gross negligence, negligence, and breach of fiduciary duty in Defendants' alleged failure to procure environmental insurance coverage for the Plaintiff's property.  See **Exhibit A**, ¶¶57-67, 69-79, 81-85.

18.     Plaintiff's fifth and sixth causes of action alleges actual and constructive fraud, and negligent misrepresentation against Defendants, seeking punitive damages in addition to "all fees, costs, including attorneys' fees and costs, penalties, settlement payment(s), or judgment incurred as a result of the Underlying Action, plus interest thereon at the legal rate, as well as all costs incurred by Old Beth in presenting and prosecuting the claims asserted herein, including reasonable attorneys' fees and costs[.]" See **Exhibit A**, ¶¶92, 99.

19.     Although defendants deny that they are in any way liable for the claims alleged or the damages claimed, based upon the allegations of injury within the Verified Complaint, Plaintiff seeks in excess of $75,000 as damages in this case.

20.     Accordingly, this is a civil action with complete diversity of citizenship where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, of

which the United States District Courts have original jurisdiction pursuant to 28 U.S.C. § 1332, and therefore may be removed to this Court pursuant to 28 U.S.C. § 1441(a) and (b).

21.     Removal to this Court is proper under 28 U.S.C. § 1441(a) because the United States District Court for the Eastern District of New York embraces the Supreme Court of New York, County of Nassau, where the removed action has been pending. 28 U.S.C. § 1441(a).

22.     By filing this Notice of Removal, UIC and Mr. Perez do not waive and hereby expressly reserves the right to assert any defense or motion available.

23.     Promptly after filing this Notice of Removal, a written Notice of Filing of Removal will be served on Plaintiffs, and to the Clerk of the Supreme Court of the State of New York, County of Nassau, as required by 28 U.S.C. § 1446(d).

**WHEREFORE**, Defendants UIC, Inc. and Joseph Perez remove this entire action from the Supreme Court of the State of New York, County of Nassau, to the United States District Court for the Eastern District of New York, and requests that this Court assume full jurisdiction over this case as provided by law.

Dated: New York, New York
       February 22, 2023

By:   */s/ Edward A. Velky*
      Edward A. Velky, Esq.
      **BRESSLER, AMERY & ROSS, P.C.**
      17 State Street
      New York, New York 10004
      (212) 425-9300
      Attorneys for Defendants,
      UIC, Inc. and Joseph Perez

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

| | |
|---|---|
| OLD BETH II, LLC, | **SUMMONS** |
| Plaintiff, | Index No.: |
| -against- | **PLACE OF TRIAL** |
| UIC, INC., a/k/a UNITED INSURANCE CONSULTANTS, INC., JOSEPH PEREZ, | Nassau County |
| Defendants. | **BASIS OF VENUE** CPLR § 503 |

TO THE ABOVE-NAMED DEFENDANTS, located at:

UIC, INC., a/k/a UNITED INSURANCE CONSULTANTS, INC.,
1 Park Way, Unit B
Upper Saddle River, New Jersey 07458

JOSEPH PEREZ
1 Park Way, Unit B
Upper Saddle River, New Jersey 07458

**YOU ARE HEREBY SUMMONED** to answer the Verified Complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorneys within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: Richmond, Virginia
January 10, 2023

WHITEFORD, TAYLOR & PRESTON LLP

By: _____
Stephen M. Faraci, Sr.

Stephen Faraci, Sr. (NYS Bar No. 5052501)
444 Madison Avenue, 4th Floor
New York, NY 10022
 and
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219

(804) 977-3300
sfaraci@wtplaw.com

Albert J. Mezzanotte (*pro hac vice application forthcoming*)
Aaron A. Nichols (*pro hac vice application forthcoming*)
Seven Saint Paul Street, Suite 1500
Baltimore, Maryland 21202
(410) 347-8700
amezzanotte@wtplaw.com
pnussbaum@wtplaw.com
anichols@wtplaw.com

*Attorneys for Plaintiff Old Beth II, LLC*

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

| | |
|---|---|
| OLD BETH II, LLC, | Index No.: |
| Plaintiff, | |
| -against- | Jury Trial Demanded |
| UIC, INC., a/k/a UNITED INSURANCE CONSULTANTS, INC., JOSEPH PEREZ, | **VERIFIED COMPLAINT** |
| Defendants. | |

Plaintiff OLD BETH II, LLC ("Plaintiff" or "Old Beth"), through its undersigned counsel,

files this Complaint against Defendants UIC, Inc., *a/k/a,* UNITED INSURANCE

CONSULTANTS, INC. ("UIC") and JOSEPH PEREZ ("PEREZ" and, collectively with UIC,

"Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.     Defendants were retained and trusted as Plaintiff's sole insurance procurement

experts and consultants.  Defendants were specifically directed by Plaintiff to obtain certain

insurance for Plaintiff's property in order to secure coverage for tort claims related to conditions

on the property.  Defendants provided Plaintiff with every assurance that such coverage would be

secured for its property.  In reality, Defendants failed to take any reasonable action to secure the

coverage for Plaintiff and, instead, affirmatively misled Plaintiff to believe its property was

adequately insured.  It was not until after Plaintiff was sued in a tort action that it discovered the

fact that Defendants misled and wholly failed to undertake their duties owed to Plaintiff, thus,

leaving Plaintiff without insurance coverage to defend the tort action and/or to provide coverage

to Plaintiff in the event of a settlement or an adverse result at trial.

2.      This action is brought to recover damages sustained by Plaintiff as a result of Defendants' failure to seek and procure general liability coverage for Plaintiff.

## THE PARTIES

3.      Old Beth is a limited liability company organized and existing under the laws of the State of New York, with its only assets and real property located in Nassau County, New York. Old Beth is an affiliated real estate company to and managed by AMZ Management, LLC ("AMZ"). Old Beth exclusively operates in the State of New York, Nassau County.

4.      Defendant UIC is a corporation organized and existing under the laws of the State of New Jersey, with its principal executive office located at 1 Park Way, Upper Saddle River, New Jersey 07458. At all times relevant hereto, UIC is and was engaged in the business of providing broad insurance procurement and consulting services to parties seeking insurance solutions and coverage, including to Old Beth. UIC is registered to conduct business in the State of New York and has been since, at least, 2008.

5.      Upon information and belief, Defendant Perez is a resident of Jersey City, New Jersey. Perez, at all times relevant to the allegations of this Complaint, was employed by UIC to assist UIC with the provision of services to Old Beth as an experienced and skilled insurance procurement specialist and consultant.

## JURISDICTION AND VENUE

6.      Jurisdiction over the subject matter of this action exists pursuant to CPLR § 301.

7.      This Court has jurisdiction over Defendants pursuant to CPLR § 302 and the common law of New York as UIC and Perez regularly and systemically conduct business in New York and otherwise have sufficient minimum contacts with New York to render the exercise of jurisdiction by this Court consistent with traditional notions of fair play and substantial justice.

2

Indeed, UIC has been registered to conduct business in New York since, at least, 2008. The allegations contained herein further support this Court's jurisdiction. Old Beth's property at issue—for which Defendants failed to properly obtain material and basic insurance coverage—is located in this jurisdiction. Thus, the harm and Defendants' overt and injurious causing acts, as alleged herein, all occurred in this jurisdiction. The services rendered by UIC and Perez were for the benefit of Old Beth, a New York entity. Moreover, Defendants regularly communicated with representatives of Old Beth in New York.

8.      Venue properly lies within this judicial district pursuant to CPLR § 503 due to the residence of Old Beth and, as alleged herein, this judicial district is the location of the alleged harm and where the causes of action arose.

### FACTS COMMON TO ALL COUNTS

#### The Relationship Between the Parties

9.      Plaintiff incorporates by reference all allegations of this Complaint as if fully restated herein.

10.     Old Beth is the owner of the property located at 501 Winding Road, Old Bethpage, New York 11804 (the "Old Beth II Property"). Old Beth purchased the Old Beth II Property in or about August 2007.[1]

11.     At all times relevant to the allegations of this Complaint, and for many years prior to the events alleged herein, AMZ, for the direct benefit of Old Beth and certain other affiliates,

---

[1]     On September 24, 2005, the prior owners of the Old Beth II Property (Winding Road Properties, Inc. and Winding Road Estates, Inc.) filed voluntary petitions for bankruptcy, pursuant to Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the Eastern District of New York. On August 17, 2007, the Bankruptcy Court entered an *Order Authorizing the Debtor to Sell and Transfer Its Premises Located at 501 Winding Road, Old Bethpage, New York* (the "Sale Order"). Plaintiff's purchase of the Old Beth II Property under the Sale Order occurred pursuant to 11 U.S.C. § 363(f).

3

retained UIC to be its trusted insurance consultant and procurement adviser, to make sure that the properties under AMZ's management, including the Old Beth II Property, were insured for all matters, including liability insurance coverage.

12.    AMZ and Old Beth had a long-standing relationship with UIC that was reflected in valid and binding contracts, the most recent and pertinent of which was titled Engagement Letter for UIC, Inc. Services (the "Contract").    A true and accurate copy of the Contract is attached hereto as **Exhibit 1**.

13.    The Contract provided that UIC will provide various services to AMZ and Old Beth.  Defendants were responsible for ensuring that properties managed by AMZ, including the Old Beth II Property, were fully insured and protected to the fullest extent possible, including for claims of bodily injury and property damage arising from hazardous materials releases. Defendants were responsible for recommending coverage, obtaining coverage, communicating with brokers and insurance companies to obtain coverage, and, among other roles, ensuring that AMZ managed properties, including the Old Beth II Property, were insured to the fullest extent possible.

14.    Specifically, and relevant to the instant dispute, the Contract stated that UIC will:

- Assist in setting the strategic risk management goals for AMZ MANAGEMENT, LLC and the steps to implement same to achieve these goals.

- Assist in the gathering of information on exposures, values, claims and losses.  This information shall provide the proper "risk profile" for AMZ MANAGEMENT, LLC for the purposes of this document; AMZ MANAGEMENT, LLC shall mean AMZ MANAGEMENT, LLC and all of its subsidiary companies and affiliated real estate companies that it manages.

- We will review all available loss data for the major coverages, i.e., Property, General Liability, Workers Compensation, Auto, Umbrella, Pollution, Professional Liability, Cyber, Liability, and Directors & Officers Liability

4

to present in the most favorable light to the insurance community while internally using it as a risk management tool and to reduce exposures when possible.

- Based on the above steps, we will work together with AMZ MANAGEMENT, LLC's risk management team to develop appropriate underwriting information for targeted areas of coverage.

* * *

- UIC, Inc. will negotiate with brokers and direct writing insurers, including reinsurers if required, using our technical abilities and marketing knowledge to achieve a comprehensive program as directed by AMZ MANAGEMENT, LLC.

*See* Ex 1.

## The Policy

15. Old Beth, along with several other corporate entities owning properties managed by AMZ, is a "Named Insured" on an Ironshore Specialty Insurance Company Site Pollution Incident Legal Liability Select policy ("the Policy").

16. The effective dates of the Policy were May 24, 2019, to May 24, 2022.

17. The Policy provided its insureds with reimbursement for remediation expenses for pollution cleanup ("Cleanup Costs") and third party claims for bodily injury and property damage ("Tort Claims") arising from qualifying pollution events at a property covered under the policy ("Covered Properties").

18. The address of the Covered Properties must be listed on the "Schedule of Covered Properties" under the policy as a necessary requirement for a claim by a Named Insured related to a Covered Property to be covered under the Policy.

19. As discussed in greater detailed below, the address of the Old Beth II Property, however, was never listed on the "Schedule of Covered Properties" under the Policy.

20. The Policy includes an Endorsement for "Specified Conditions Exclusions" (Endorsement # 22, the "Pollution Endorsement"). The Pollution Endorsement is a carve out for

5

specific pollution events at AMZ managed properties that were excluded from Cleanup Cost coverage for known pre-existing pollution events ("Pre-Existing Conditions") at Covered Properties, but were able to receive coverage for Tort Claims arising from Pre-Existing Conditions at the Covered Property or beyond the boundaries of the Covered Properties. Stated differently, due to known Pre-Existing Conditions that arose before the Policy's effective date, Ironshore was not willing to provide Cleanup Cost coverage for pollution Cleanup Costs at certain Covered Properties; Ironshore, however, was willing to provide coverage, under the Pollution Endorsement, for Tort Claims that may arise out of the same Pre-Existing Conditions where coverage for Cleanup Costs was expressly excluded from coverage because it was known to exist before the Policy's effective date.

21.     There were two Covered Properties listed on the Pollution Endorsement coverage exclusions for Cleanup Costs arising from Pre-Existing Conditions, but expressly have coverage for Tort Claims arising from those same Pre-Existing Conditions, namely 1311 Union Avenue in West Springfield, MA and 110 Sodom Road in Milton, PA.

**The Old Beth II Property**

22.     The Old Beth II Property was not listed as a covered property on the Pollution Endorsement.

23.     An insurance procurement consultant and representative, such as Defendants, of ordinary skill would have known that the Old Beth II Property should have been added to the "Schedule of Covered Properties" under the Policy because Defendants had all necessary information to ensure it was covered along with numerous other AMZ managed properties. Indeed, Defendants properly listed **58 other properties** on the "Schedule of Covered Properties." In short, given the amount at stake, a competent insurance procurement expert and consultant

6

would not have intentionally or negligently excluded the Old Beth II Property for the "Schedule of Covered Properties."

24.     Indeed, had Defendants undertaken a minimum amount of diligence, as is required by such insurance procurement experts and consultants, they would have unilaterally known that the Old Beth Property was left off the "Schedule of Covered Properties" and would have fixed the error without prompting from Old Beth.

25.     Despite the fact that Defendants, in their role as insurance procurement experts and consultants, should have unilaterally acted to ensure coverage, Old Beth requested numerous times that the address of the Old Beth II Property be added to the Policy's "Schedule of Covered Properties."

26.     Old Beth repeatedly made clear to Defendants that it sought to obtain insurance coverage for the Old Beth II Property through Defendants.  Or, at a minimum, had such insurance been requested and subsequently denied by Ironshore, Old Beth would have sought coverage for Tort Claims through the Pollution Endorsement, as was provided for two other properties managed by AMZ.

27.     On February 7, 2020, AMZ's Chief Financial Officer, Matthew Lomuti ("Lomuti"), emailed Perez and asked him to "[c]onfirm that Winding Road address [the Old Beth II Property] is on both the Property and Pollution policies," *i.e.,* the Policy.

28.     On March 9, 2020, Lomuti again emailed Perez advising him that a list of properties for liability insurance coverage used by Defendants was not updated to include the Old Beth II Property.

7

29.     On March 19, 2020, Lomuti emailed Perez and included a chart with an updated list of properties for which Old Beth sought to procure liability insurance coverage.  Consistent with prior communications and intentions, included on this list was the Old Beth II Property.

30.     On April 17, 2020, Perez provided Lomuti copies of the Policy, including the list of properties on the "Schedule of Covered Properties" and the properties listed on the Pollution Endorsement, making no mention of any reasoning as to why the Old Beth II Property was not included on the Policy or expressing any concern as to the availability of coverage for the Old Beth II Property.

31.     Still having failed to add the Old Beth Property II to the Policy (or the Pollution Endorsement), Lomuti, on May 26, 2020, again emailed Perez and attached a copy of the then-current version of the "Schedule of Covered Properties."  Therein, Old Beth hand wrote instructions for Perez to add the Old Beth II Property to the Policy.

32.     Defendants through various phone conversations at or around this time, in turn, assured Old Beth that they would procure the insurance coverage sought by Old Beth or, at the very least, that reasonable efforts would be made to attempt to procure such coverage of the Old Beth II Property.

33.     With this understanding, Old Beth was never contacted by Defendants regarding failed efforts to obtain insurance coverage or denials from brokers or insurance companies for the Old Beth II Property.  Accordingly, Old Beth was, at all times relevant, under the impression, based on omissions and representations made by Defendants that the Old Beth II Property was added to the "Schedule of Covered Properties."

8

34.     As further explained below, the Village of Farmingdale, New York initiated a law suit against Old Beth on July 20, 2020, for Tort Claims arising from historic pollution at the Old Beth II Property that pre-dated Old Beth's ownership of it.

35.     On September 15, 2020, Lomuti emailed Perez asking: "Winding Road was added to both the property and pollution policies [the Pollution Endorsement] when we discussed it several months ago, correct?"

36.     On September 17, 2020, Lomuti emailed Perez, again ensuring that the Old Beth II Property was covered by its liability insurance policy: "Any updates on the property insurance? Also we want to confirm that Winding Road [the Old Beth II Property] was added to both the property and pollution policies [the Pollution Endorsement]."

37.     In an effort to conceal his reckless conduct and gross negligence and intentional acts and omissions, Perez emailed on September 17, 2020 and stated that "501 Winding [R]oad… is not a covered location on the pollution policy because of the historical pollution issues there." There was no indication from Perez that he took any reasonable efforts to add the Old Beth II Property to the Policy or, in the event of an actual rejection, that he attempted to add the property to the Pollution Endorsement.

38.     On September 22, 2020, Perez nevertheless emailed Lomuti requesting any environmental site assessment reports for the Old Beth II Property, as would be required for Ironshore to conduct its initial underwriting of the Old Beth II Property as a Covered Location. Lomuti promptly responded and attached the requested information later that same day.

39.     On September 28, 2020, Lomuti again emailed Perez asking: "Did you speak with the Broker/Insurer about [the Old Beth II Property]?" Perez responded as follows: "Yes and I sent him the [Old Beth II Property environmental site assessment report]. As I previously mentioned,

9

the insurer may decide to cover the location, but likely will limit coverage to new conditions and exclude pre-existing conditions."

40.  Despite Old Beth's repeated and continuous requests, Defendants' clear knowledge that Old Beth sought to procure coverage for the Old Beth II Property, Defendants' assurances that it would procure such coverage, and Defendants' failure to inform Old Beth that it failed to obtain any coverage for the Old Beth II Property, Defendants failed to obtain liability insurance for the Old Beth II Property under the Policy or, at the very least, the Pollution Endorsement.

41.  Defendants, pursuant to the terms of the Contract, undertook responsibility for ensuring that the Old Beth II Property was insured. The Old Beth II Property, however, was not listed as a "Schedule of Covered Properties," nor was it, at a minimum, listed as a covered property under the Pollution Endorsement.

**Tort Claims Against Old Beth II**

42.  Defendants' failure to obtain any insurance coverage for the Old Beth II Property came to light on or about July 27, 2020, when Old Beth was named as a defendant in an environmental-contamination tort lawsuit filed in the Supreme Court of the State of New York, County of Nassau (the "Underlying Action"), by the Village of Farmingdale, an incorporated village located in the Town of Oyster Bay in Nassau County, New York. In the Underlying Action, styled *Village of Farmingdale v. ALJO-GEFA Precision Manufacturing, LLC, et al.*, Index No. 607613/2020,[2] the Village of Farmingdale essentially alleges that a host of defendants (including Old Beth) are responsible for contamination of the Village of Farmingdale's drinking water,

---

[2]  On or about September 2, 2021, the Court consolidated Index No. 607613/2020 with another case pending in the Supreme Court of Nassau County styled, *Village of Farmingdale v. Aluminum Louvre Corp.*, Index No. 603443/2019. Due to this consolidation, Index No. 607613/2020 is proceeding with the court under Index No. 603443/2019.

10

causing injury to a class of plaintiffs. To be sure, the Underlying Action is a third-party action for Tort Claims filed against Old Beth and other defendants. With regard to Old Beth, the Underlying Action relates to the Old Beth II Property.

43.  Had the Old Beth II Property been listed on "Schedule of Covered Properties" or as a covered property under the Pollution Endorsement, Old Beth would have been entitled to insurance coverage for the Underlying Action.

44.  The lack of insurance leaves Old Beth uncovered for the liabilities associated with the Underlying Action including costs, expenses, attorneys' fees, and potential damages stemming from the Underlying Action that otherwise would have been covered had Defendants not acted intentionally, grossly and recklessly in failing to procure essential insurance coverage. It is these damages Old Beth seeks to recover through this instant action.

45.  Defendants' failure to come clean and admit its fault further caused injury to Old Beth because it prohibited Old Beth from seeking essential insurance coverage by other means prior to the filing of the Underlying Action. Instead, Old Beth was led to believe that Defendants acted to ensure that the Old Beth II Property was listed on the "Schedule of Covered Properties" and that it was protected from Tort Claims, such as the Underlying Action.

46.  Confirming the intentional, grossly negligent and reckless nature of Defendants' failures, Perez, during a September 28, 2020 call with Old Beth, confirmed that he "dropped the ball" with respect to procuring coverage for the Old Beth II Property.

47.  Further demonstrating the egregious nature of Defendants' acts and omissions, after the Underlying Action was filed, Defendants learned that Ironshore, the insurance underwriter, would have secured for the Old Beth II Property "new conditions coverage," *e.g.*, coverage for new third-party tort claims. Or, like with two other AMZ-managed properties, Tort Claims

11

coverage under the Pollution Endorsement. Ironshore confirmed Defendants' improper acts and omissions by noting that the Old Beth II Property "was never scheduled on the policy and therefore there is no coverage currently."

48.     Defendants' failure to acquire for Old Beth basic but essential insurance coverage—despite repeated requests and assurances from Defendants that such coverage would be procured—has caused and will continue to cause significant injury to Old Beth as the Underlying Action is ongoing.

### FIRST CAUSE OF ACTION
#### BREACH OF CONTRACT
#### (*OLD BETH VS. UIC*)

49.     Plaintiff incorporates each of the allegations of this Complaint as if as if fully restated herein.

50.     Plaintiff and UIC entered into a valid and binding contract—the Contract—pursuant to which UIC was obligated to procure liability insurance coverage for the Old Beth II Property, including, if necessary, coverage under the Pollution Endorsement.

51.     Pursuant to the Contract, and as affirmed by actions undertaken by UIC during the scope of its engagement with Old Beth, UIC, through, among others, Perez, agreed that it would procure insurance coverage for the Old Beth II Property.

52.     Old Beth performed its contractual obligations in the form of payment to UIC for its services.

53.     UIC breached the Contract by, among other things, failing to procure the insurance coverage sought by Old Beth and promised by UIC.

54.     UIC further breached the Contract by failing to inform Old Beth that it undertook no action to procure such insurance, leaving Old Beth to believe that its property was covered

12

under the Policy. It was not until after the Underlying Action was instituted that Old Beth learned of UIC's failures.

55.    As a result of UIC's breach, Old Beth has suffered identifiable and reasonably foreseeable damages. The damages suffered by Old Beth are directly and proximately caused by UIC's breach of contract. UIC knew and understood that by not procuring the insurance coverage requested by Old Beth that it was leaving Old Beth susceptible to a gap in insurance coverage, exposing Old Beth to potential liability, without appropriate insurance coverage. Further, by failing to notify Old Beth that it failed to undertake any action to procure such insurance coverage, UIC left Old Beth with no opportunity to seek coverage elsewhere, negotiate with Ironshore to have the Old Beth II Property added to the Pollution Endorsement (like two other AMZ managed properties), or mitigate risks associated with the Old Beth II Property by other means. As the Underlying Action would have been covered by the Policy and/or the Pollution Endorsement, it is clear that UIC's breach of contract caused Old Beth's damages.

WHEREFORE, Old Beth prays for judgment against UIC in an amount to be determined at trial, but not less than all fees, costs, including attorneys' fees and costs, penalties, settlement payment(s), or judgment incurred as a result of the Underlying Action, plus interest thereon at the legal rate, as well as all costs incurred by Old Beth in presenting and prosecuting the claims asserted herein, including reasonable attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

### SECOND CAUSE OF ACTION
#### GROSS NEGLIGENCE
#### (*OLD BETH V. UIC & PEREZ*)

56.    Plaintiff incorporates each of the allegations of this Complaint as if as if fully restated herein.

13

57. Based upon Defendants' representations that they possessed the expertise, experience, and skill to provide Old Beth reasonable insurance coverage, Old Beth placed significant trust and confidence in Defendants. Indeed, UIC represents that it possesses "Industry-Leading Expertise" and that it "[e]xists to guide [its] clients through the vagaries of the risk management and insurance procurement process." Specifically, UIC represents that it has "extensive knowledge of placing and managing significant deductible liability policies and first-party property and marine coverages."

58. Defendants owed Old Beth a duty to perform professional services in connection with Defendants' insurance consulting business. Defendants undertook responsibilities and were trusted to provide Old Beth with a level of service and care consistent with industry standards.

59. Defendant knew that Old Beth was placing its trust and confidence in Defendants based upon representations made by Defendants' as to their expertise, experience, and skill. Old Beth reasonably relied upon Defendants to procure the basic, but material, coverage under the Policy or, at the very least, the Pollution Endorsement, based on its express statements that it would add the Old Beth II Property to the Policy. As such, Defendants knew that Old Beth was relying upon Defendants to perform the professional services they had a duty to perform.

60. Defendants grossly and recklessly breached the standard of care by failing to initially identify the fact that the Old Beth II Property was left off of the "Schedule of Covered Properties" under the Policy. Industry standards mandate that professionals like Defendants employ reasonable efforts to ensure all requested coverage is obtained, including by cross-referencing named insureds and their respective properties are covered under applicable policies. The fact that Defendants failed to identify this mistake and remedy it, constitutes conduct that falls

14

well-below the standard of care. Instead, Old Beth caught the mistake and was forced to repeatedly request that the Old Beth II Property be added to the Policy.

61.     Even still, Defendants expressly confirmed that it was undertaking the necessary steps to procure for Old Beth insurance coverage under the Policy, which would have provided coverage for third-party tort claims, such as the Underlying Action. But, in actuality, it did not. This represents a gross and reckless departure from the standard of care applicable to Defendants and other professionals in their industry.

62.     Further evidencing recklessness and gross negligence, Defendants failed to properly inform Old Beth that it undertook no action to procure insurance coverage for the Old Beth II Property. Had Old Beth known that the Old Beth II Property was not added to the "Schedule of Covered Properties" or that Ironshore rejected the addition to the Policy due to pre-existing conditions, it could have obtained coverage for third-party tort actions, such as the Underlying Action. But Defendants failed take such reasonable and industry standard actions and, thus, precluded Old Beth from the opportunity of obtaining essential insurance coverage.

63.     At a minimum, and in the event that Ironshore did reject coverage under the Policy, Defendants should have made every reasonable effort to add the Old Beth II Property to the Pollution Endorsement—*as was obtained for two other AMZ-managed properties*. Defendants failure to, at a minimum, obtain the same insurance coverage that was provided to similarly situated AMZ-managed properties, was a gross departure from the standard of care applicable to Defendants and other professionals in their industry.

64.     Instead, Defendants failed to inform Old Beth of its utter failure to take any action to procure any level of insurance for the Old Beth II Property and left Old Beth with no opportunity to seek coverage elsewhere, negotiate with Ironshore to have the Old Beth II Property added to the

15

Pollution Endorsement (like two other AMZ managed properties), or mitigate risks associated with the Old Beth II Property by other means.

65.     Defendants owed a duty of care to Old Beth to act as a reasonably competent insurance advisor, consultant and procurer and exercise reasonable skill, care, and diligence in the execution of the services that Defendants were entrusted to perform, including procuring liability insurance coverage for the Old Beth II Property under the Policy or, at the very least, under the Pollution Endorsement.  Defendants owed Old Beth the duty to procure the requested coverage in a reasonable period of time and, in the event Defendants were unable to procure such coverage, Defendants had a duty to advise or direct Old Beth as to those circumstances.

66.     Such failures constitute gross departures from the standard of care applicable to brokers and consultants in this industry, including those applicable to Defendants.

67.     As a result of Defendants' breaches of the standard of care, Plaintiff has suffered, and continues to suffer, identifiable and reasonably foreseeable damages.  The damages suffered by Plaintiffs were directly and proximately caused by Defendants' breach of duties owed to Old Beth.

WHEREFORE, Old Beth prays for judgment against UIC in an amount to be determined at trial, but not less than all fees, costs, including attorneys' fees and costs, penalties, settlement payment(s), or judgment incurred as a result of the Underlying Action, plus interest thereon at the legal rate, as well as all costs incurred by Old Beth in presenting and prosecuting the claims asserted herein, including reasonable attorneys' fees and costs, punitive damages, and such other and further relief as the Court deems just and proper.

16

### THIRD CAUSE OF ACTION
#### NEGLIGENCE
#### (*OLD BETH V. UIC & PEREZ*)

68.     Plaintiff incorporates each of the allegations of this Complaint as if as if fully restated herein.

69.     Based upon Defendants' representations that they possessed the expertise, experience, and skill to provide Old Beth reasonable insurance coverage, Old Beth placed significant trust and confidence in Defendants.  Indeed, UIC represents that it possesses "Industry-Leading Expertise" and that it "[e]xists to guide [its] clients through the vagaries of the risk management and insurance procurement process."   Specifically, UIC represents that it has "extensive knowledge of placing and managing significant deductible liability policies and first-party property and marine coverages."

70.     Defendants owed Old Beth a duty to perform professional services in connection with Defendants' insurance consulting business.  Defendants undertook responsibilities and were trusted to provide Old Beth with a level of service consistent with industry standards.

71.      Defendant knew that Old Beth was placing its trust and confidence in Defendants based upon representations made by Defendants' as to their expertise, experience, and skill. Old Beth reasonably relied upon Defendants to procure the basic, but material, coverage under the Policy or, at the very least, the Pollution Endorsement, based on its express statements that it would add the Old Beth II Property to the Policy.  As such, Defendants knew that Old Beth was relying upon Defendants to perform the professional services they had a duty to perform.

72.     Defendants breached the standard of care by failing to initially identify the fact that the Old Beth II Property was left off of the "Schedule of Covered Properties" under the Policy. Industry standards mandate that professionals like Defendants employ reasonable efforts to ensure

17

all requested coverage is obtained, including by cross-referencing named insureds and their respective properties are covered under applicable policies. The fact that Defendants failed to identify this mistake and remedy it, constitutes conduct that falls well-below the standard of care. Instead, Old Beth caught the mistake and was forced to repeatedly request that the Old Beth II Property be added to the Policy.

73. Even still, Defendants expressly confirmed that it was undertaking the necessary steps to procure for Old Beth insurance coverage under the Policy, which would have provided coverage for third-party tort claims, such as the Underlying Action. But, in actuality, it did not.

74. Moreover, Defendants failed to properly inform Old Beth that it undertook no action to procure insurance coverage for the Old Beth II Property. Had Old Beth known that the Old Beth II Property was not added to the "Schedule of Covered Properties" or that Ironshore rejected the addition to the Policy due to pre-existing conditions, it could have obtained coverage for third-party tort actions, such as the Underlying Action. But Defendants failed take such reasonable and industry standard actions and, thus, precluded Old Beth from the opportunity of obtaining essential insurance coverage.

75. At a minimum, and in the event that Ironshore did reject coverage under the Policy, Defendants should have made every reasonable effort to add the Old Beth II Property to the Pollution Endorsement—*as was obtained for two other AMZ-managed properties*. Defendants failure to, at a minimum, obtain the same insurance coverage that was provided to similarly situated AMZ-managed properties, was a gross departure from the standard of care applicable to Defendants and other professionals in their industry.

76. Instead, Defendants failed to inform Old Beth of its utter failure to take any action to procure any level of insurance for the Old Beth II Property and left Old Beth with no opportunity

18

to seek coverage elsewhere, negotiate with Ironshore to have the Old Beth II Property added to the Pollution Endorsement (like two other AMZ managed properties), or mitigate risks associated with the Old Beth II Property by other means.

77.     Defendants owed a duty of care to Old Beth to act as a reasonably competent insurance advisor, consultant and procurer and exercise reasonable skill, care, and diligence in the execution of the services that Defendants were entrusted to perform, including procuring liability insurance coverage for the Old Beth II Property under the Policy or, at the very least, under the Pollution Endorsement. Defendants owed Old Beth the duty to procure the requested coverage in a reasonable period of time and, in the event Defendants were unable to procure such coverage, Defendants had a duty to advise or direct Old Beth as to those circumstances.

78.     Such failures constitute gross departures from the standard of care applicable to brokers and consultants in this industry, including those applicable to Defendants.

79.     As a result of Defendants' breaches of the standard of care, Plaintiff has suffered, and continues to suffer, identifiable and reasonably foreseeable damages. The damages suffered by Plaintiffs were directly and proximately caused by Defendants' breach of duties owed to Old Beth.

WHEREFORE, Old Beth prays for judgment against UIC in an amount to be determined at trial, but not less than all fees, costs, including attorneys' fees and costs, penalties, settlement payment(s), or judgment incurred as a result of the Underlying Action, plus interest thereon at the legal rate, as well as all costs incurred by Old Beth in presenting and prosecuting the claims asserted herein, including reasonable attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

19

## FOURTH CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
#### (*OLD BETH V. UIC & PEREZ*)

80.     Plaintiff incorporates each of the allegations of this Complaint as if as if fully restated herein.

81.     UIC and Perez, as Old Beth's long-time insurance consultant, owed fiduciary duties and obligations to Old Beth knowing that it was placing its total trust and reliance upon Defendants' representations and undertaking of the responsibility to provide Old Beth with adequate and essential insurance procurement services, in a timely manner, and keep Old Beth reasonably informed. Old Beth sought the expertise of Defendants as its trusted advisor and, accordingly, Defendants were under a duty to act for and give advice to Old Beth on matters within the scope of their relationship.

82.     Defendants' fiduciary duties included the obligation to act prudently, in good faith, and in the best interest of Old Beth with respect to the insurance coverage for which Plaintiffs retained Defendants to procure. Further, Defendants were obligated to keep Old Beth reasonably informed.

83.     As discussed herein, Defendants, through their acts and omissions, breached their fiduciary duties owed to Old Beth by, among other things, failing to identify and remedy the fact that the Old Beth II Property was left off of the "Schedule of Covered Properties," despite the fact that Old Beth specifically requested that it be included, failing to undertake any action after Old Beth informed Defendants of the fact that the Old Beth II Property was negligently left off of the "Schedule of Covered Properties," failing to inform Old Beth of the fact that Defendants undertook no action to actually procure insurance coverage under the Policy for the Old Beth II Property, and, in the event that Ironshore rejected coverage under the Policy, failing to undertake all

20

reasonable efforts to promptly have the Old Beth II Property added to the Pollution Endorsement, like two other AMZ-managed properties. Had Defendants kept Old Beth reasonably informed of its actions and inactions—instead of deliberately leading Old Beth to believe Defendants were diligently undertaking their role as a trusted insurance procurement specialist—it would have been able to seek coverage elsewhere, negotiate with Ironshore to have the Old Beth II Property added to the Pollution Endorsement (like two other AMZ managed properties), or mitigate risks associated with the Old Beth II Property by other means.

84.     Defendants knew they failed to obtain coverage for the Old Beth II Property and misled Old Beth into thinking the property was insured so that they could continue to collect payment from Old Beth under the terms of the Contract. Indeed, had Old Beth known of Defendants' intentional acts and omissions, the Contract would have been terminated based on Defendants' conduct.

85.     As a result of Defendants' breach of its fiduciary duties owed to Old Beth, Old Beth has suffered, and continues to suffer, identifiable and reasonably foreseeable damages. The damages suffered by Old Beth are the direct and proximate result of Defendants' breach of their fiduciary duty.

WHEREFORE, Old Beth prays for judgment against UIC in an amount to be determined at trial, but not less than all fees, costs, including attorneys' fees and costs, penalties, settlement payment(s), or judgment incurred as a result of the Underlying Action, plus interest thereon at the legal rate, as well as all costs incurred by Old Beth in presenting and prosecuting the claims asserted herein, including reasonable attorneys' fees and costs, punitive damages, and such other and further relief as the Court deems just and proper.

21

### FIFTH CAUSE OF ACTION
#### ACTUAL AND CONSTRUCTIVE FRAUD
#### (*OLD BETH V. UIC & PEREZ*)

86. Plaintiff incorporates each of the allegations of this Complaint as if as if fully restated herein.

87. UIC and Perez, as Old Beth's long-time insurance consultant, owed fiduciary duties and obligations to Old Beth knowing that it was placing its total trust and reliance upon Defendants' representations and undertaking of the responsibility to provide Old Beth with adequate and essential insurance procurement services, in a timely manner, and keep Old Beth reasonably informed. Old Beth sought the expertise of Defendants as its trusted advisor and, accordingly, Defendants were under a duty to act for and give advice to Old Beth on matters within the scope of their relationship.

88. Defendants made certain fraudulent representations and omissions to Old Beth concerning the insurance coverage for the Old Beth II Property. Old Beth specifically requested, on multiple occasions, for Defendant to obtain liability insurance for the Old Beth II Property, and Defendant agreed to obtain the coverage sought by Old Beth.

89. In truth and fact, Defendants did not procure the liability insurance coverage requested by Old Beth. Instead, and unbeknownst to Old Beth, Defendants undertook no action to reasonably procure insurance coverage for the Old Beth II Property. Not only did Defendants make affirmative representations that the insurance coverage would be acquired for the Old Beth II Property or that Defendants would endeavor and take reasonable efforts to obtain such coverage, Defendants misled Old Beth and withheld the fact that they failed to undertake such action, leaving Old Beth with no opportunity to seek coverage elsewhere, negotiate with Ironshore to have the Old Beth II Property added to the Pollution Endorsement (like two other AMZ managed

22

properties), or mitigate risks associated with the property by other means. Such information was solely in the possession of Defendants and was not provided to Old Beth.

90.     Defendants knew they failed to obtain coverage for the Old Beth II Property and misled Old Beth into thinking the property was insured so that they could continue to collect payment from Old Beth under the terms of the Contract. Indeed, had Old Beth knew of Defendants' intentional acts and omissions, the Contract would have been terminated based on Defendants' conduct.

91.     Plaintiffs, believing in the skill, experience, and honesty of Defendant, relied upon Defendants' misrepresentations and omissions to their detriment. Defendants made the representations and omissions with knowledge of their falsity and with intent to induce Old Beth to rely.

92.     By reason of Defendants' misrepresentations and omissions, which are described in detail above and incorporated herein, Old Beth has suffered, and will continue to suffer, identifiable and reasonably foreseeable damages. The damages suffered by Old Beth are directly and proximately caused by the misrepresentations and omissions of Defendants.

WHEREFORE, Old Beth prays for judgment against UIC in an amount to be determined at trial, but not less than all fees, costs, including attorneys' fees and costs, penalties, settlement payment(s), or judgment incurred as a result of the Underlying Action, plus interest thereon at the legal rate, as well as all costs incurred by Old Beth in presenting and prosecuting the claims asserted herein, including reasonable attorneys' fees and costs, punitive damages, and such other and further relief as the Court deems just and proper.

23

### SIXTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION
### (*OLD BETH V. UIC & PEREZ*)

93.     Plaintiff incorporates each of the allegations of this Complaint as if as if fully restated herein.

94.     UIC and Perez, as Old Beth's long-time insurance consultant, owed fiduciary duties and obligations to Old Beth knowing that it was placing its total trust and reliance upon Defendants' representations and undertaking of the responsibility to provide Old Beth with adequate and essential insurance procurement services, in a timely manner, and keep Old Beth reasonably informed. Old Beth sought the expertise of Defendants as its trusted advisor and, accordingly, Defendants were under a duty to act for and give advice to Old Beth on matters within the scope of their relationship.

95.     Defendants, at a minimum, made certain negligent representations and omissions to Old Beth concerning the insurance coverage for the Old Beth II Property. Old Beth specifically requested, on multiple occasions, for Defendant to obtain liability insurance for the Old Beth II Property, and Defendant agreed to obtain the coverage sought by Old Beth.

96.     In truth and fact, Defendants did not procure the liability insurance coverage requested by Old Beth. Instead, and unbeknownst to Old Beth, Defendants undertook no action to reasonably procure insurance coverage for the Old Beth II Property. Not only did Defendants make affirmative representations that the insurance coverage would be acquired for the Old Beth II Property or that Defendants would endeavor and take reasonable efforts to obtain such coverage, Defendants, at a minimum, negligently misled Old Beth and withheld the fact that they failed to undertake such action, leaving Old Beth with no opportunity to seek coverage elsewhere, negotiate with Ironshore to have the Old Beth II Property added to the Pollution Endorsement (like two other

24

AMZ managed properties), or mitigate risks associated with the property by other means. Such information was solely in the possession of Defendants and was not provided to Old Beth.

97.     Defendants knew they failed to obtain coverage for the Old Beth II Property and misled Old Beth into thinking the property was insured so that they could continue to collect payment from Old Beth under the terms of the Contract. Indeed, had Old Beth knew of Defendants' (at a minimum) negligent acts and omissions, the Contract would have been terminated based on Defendants' conduct.

98.     Plaintiffs, believing in the skill, experience, and honesty of Defendant, relied upon Defendants' (at a minimum) negligent misrepresentations and omissions to their detriment. Defendants made the representations and omissions to Old Beth and reasonably knew or should have known of their falsity.

99.     By reason of Defendants' negligent misrepresentations and omissions, which are described in detail above and incorporated herein, Old Beth has suffered, and will continue to suffer, identifiable and reasonably foreseeable damages. The damages suffered by Old Beth are directly and proximately caused by the misrepresentations and omissions of Defendants.

WHEREFORE, Old Beth prays for judgment against UIC in an amount to be determined at trial, but not less than all fees, costs, including attorneys' fees and costs, penalties, settlement payment(s), or judgment incurred as a result of the Underlying Action, plus interest thereon at the legal rate, as well as all costs incurred by Old Beth in presenting and prosecuting the claims asserted herein, including reasonable attorneys' fees and costs, punitive damages, and such other and further relief as the Court deems just and proper.

25

Dated:  Richmond, Virginia
        January 10, 2023

WHITEFORD, TAYLOR & PRESTON LLP

By: _Stephen M. Faraci, Sr._____
        Stephen M. Faraci, Sr.

Stephen M. Faraci, Sr. (NYS Bar No. 5052501)
444 Madison Avenue, 4th Floor
New York, NY 10022
  and
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219
(804) 977-3300
sfaraci@wtplaw.com

Albert J. Mezzanotte (*pro hac vice application forthcoming*)
Aaron A. Nichols (*pro hac vice application forthcoming*)
Seven Saint Paul Street, Suite 1500
Baltimore, Maryland 21202
(410) 347-8700
amezzanotte@wtplaw.com
pnussbaum@wtplaw.com
anichols@wtplaw.com

*Attorneys for Plaintiff Old Beth II, LLC*

26

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

OLD BETH II, LLC,

    Plaintiff,

 -against-

UIC, INC., a/k/a UNITED INSURANCE CONSULTANTS, INC.,
JOSEPH PEREZ,

    Defendants.

Index No.:

**VERIFICATION**

  I, Stephen M. Faraci, Sr., am an attorney duly admitted to practice law in the Courts of

this State, and I affirm the following under penalties of perjury:

  I am the attorney for the Plaintiff in the above entitled action. I have read the foregoing

VERIFIED COMPLAINT and know the contents thereof, and upon information and belief,

affirmant believes after an inquiry reasonable under the circumstances, the matters alleged herein

to be true, and that the contentions herein are not frivolous, as that term is defined

in 22 NYCRR § 130-1.1(c).

  The reason this verification is made by affirmant and not by Plaintiff is that the Plaintiff

herein resides in a County other than the County in which I maintain my offices.

  The source of affirmant's information and the grounds of his/her belief are personal

knowledge, communications, papers, reports and investigations contained in the file maintained

by this office.

Dated: Richmond, Virginia
   January 10, 2023

WHITEFORD, TAYLOR & PRESTON LLP

By: _____
   Stephen M. Faraci, Sr.

Stephen Faraci, Sr. (NYS Bar No. 5052501)
444 Madison Avenue, 4th Floor
New York, NY 10022

and
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219
(804) 977-3300
sfaraci@wtplaw.com

28

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

OLD BETH II, LLC,

                    Plaintiff,

     -against-                                                    Index No.:

UIC, INC., a/k/a UNITED INSURANCE CONSULTANTS, INC.,
JOSEPH PEREZ,

                    Defendants.

## NOTICE OF ELECTRONIC FILING
### (Mandatory Case)
(Uniform Rule § 202.5-bb)

**You have received this Notice because:**

> 1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

> 2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
  Give this Notice to your attorney. (Attorneys: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney:**
  **You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

  **If you choose to participate in e-filing, you must have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

  The **benefits of participating in e-filing** include:

    - serving and filing your documents electronically

    - free access to view and print your e-filed documents

    - limiting your number of trips to the courthouse

    - paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit: www.nycourts.gov/efile-unrepresented or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**
**(E-filing is Mandatory for Attorneys)**

An attorney representing a party who is served with this notice must either:

1) immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile; or

2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov).

Dated: Richmond, Virginia            WHITEFORD, TAYLOR & PRESTON LLP
January 10, 2023

By: */s/ Stephen M. Faraci, Sr.*
Stephen M. Faraci, Sr.

Stephen Faraci, Sr. (NYS Bar No. 5052501)
444 Madison Avenue, 4th Floor
New York, NY 10022
  and
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219
(804) 977-3300
sfaraci@wtplaw.com

Albert J. Mezzanotte (*pro hac vice application forthcoming*)
Aaron A. Nichols (*pro hac vice application forthcoming*)
Seven Saint Paul Street, Suite 1500
Baltimore, Maryland 21202
(410) 347-8700
amezzanotte@wtplaw.com
pnussbaum@wtplaw.com
anichols@wtplaw.com

*Attorneys for Plaintiff Old Beth II, LLC*

To:

UIC, INC., a/k/a UNITED INSURANCE CONSULTANTS, INC.,
1 Park Way, Unit B
Upper Saddle River, New Jersey 07458

JOSEPH PEREZ
1 Park Way, Unit B
Upper Saddle River, New Jersey 07458

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

OLD BETH II, LLC,

    Plaintiff,

 -against-

UIC, INC., a/k/a UNITED INSURANCE CONSULTANTS, INC., JOSEPH PEREZ,

    Defendants.

Index No.:

**NOTICE OF APPEARANCE**

   PLEASE TAKE NOTICE that Stephen M. Faraci, Sr. of the law firm Whiteford, Taylor & Preston, LLP hereby appears as counsel in this action on behalf of Plaintiff, and hereby demands that all further papers in this proceeding be served upon the undersigned at the office address stated below.

Dated: Richmond, Virginia
   January 10, 2023

WHITEFORD, TAYLOR & PRESTON LLP

By: _____
   Stephen M. Faraci, Sr.

Stephen Faraci, Sr. (NYS Bar No. 5052501)
444 Madison Avenue, 4th Floor
New York, NY 10022
 and
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219
(804) 977-3300
sfaraci@wtplaw.com

TO:
All counsel of record

# <u>Exhibit 1</u>

## To Verified Complaint

## ENGAGEMENT LETTER FOR UIC, INC. SERVICES

### For AMZ MANAGEMENT, LLC
### For August 1, 2019 until cancelled

**UIC, Inc.** will provide the following services:

- We will audit on a serial basis all insurance policies providing comments and recommendations where applicable. We will evaluate the coverage afforded to the exposures presented and advise accordingly on any significant gaps or materiality issues.

- Review current risk management structure, i.e. retentions-to-premium ratios.

- Assist in setting the strategic risk management goals for **AMZ MANAGEMENT, LLC** and the steps to implement same to achieve these goals.

- Assist in the gathering of information on exposures, values, claims and losses. This information shall provide the proper "risk profile" for **AMZ MANAGEMENT, LLC** for the purposes of this document; **AMZ MANAGEMENT, LLC** shall mean **AMZ MANAGEMENT, LLC** and all of its subsidiary companies and affiliated real estate companies that it manages.

- We will review all available loss data for the major coverages, i.e., Property, General Liability, Workers Compensation, Auto, Umbrella, Pollution, Professional Liability, Cyber, Liability, and Directors & Officers Liability to present in the most favorable light to the insurance community while internally using it as a risk management tool and to reduce exposures when possible.

- Based on the above steps, we will work together with **AMZ MANAGEMENT, LLC's** risk management team to develop appropriate underwriting information for targeted areas of coverage.

- **UIC, Inc.** will prepare insurance specification so that alternative proposals can be solicited as needed and required by **AMZ MANAGEMENT, LLC.**

- **UIC, Inc.** will negotiate with brokers and direct writing insurers, including re-insurers if required, using our technical abilities and marketing knowledge to achieve a comprehensive program as directed by **AMZ MANAGEMENT, LLC.**

- We will analyze all proposals submitted and review them with you and your insurance management team so that you can make informed policy and coverage selections.

- To ensure that **AMZ MANAGEMENT, LLC** is appropriately protected once a proposal is selected, the binders accepted and agreed to by **AMZ MANAGEMENT,**

1

LLC, from the brokers and/or direct writers must be comprehensive. This will help to avoid any gray areas in your coverage in the event of an occurrence or claim prior to receiving the policies. We will request binders be produced in accordance with the specifications or accepted proposals.

- Once the insurance policies are issued, **UIC, Inc.** will review and fine-tune them. It is fairly common to find many coverages that are "inadvertently omitted" other than that which has been specifically bound.

- The formation of an insurance "work group" from Operations, Finance, Insurance/HR, Safety and other key positions should be designated to steer the insurance and risk management program. It is critical to **AMZ MANAGEMENT, LLC**'s risk management program that the various operations interface with a risk management team and that the information flow be consistent, accurate and timely so that the insurance/risk management program goals can be achieved and monitored.

- **UIC, Inc.** will review designated key contracts and provide input, along with client counsel, in order to provide the best way to transfer as much risk as possible.

- We will visit you approximately every six (6) to eight (8) weeks, or as agreed, to discuss ways to improve coverages and implement the action plan we have developed with you. We do not work in a vacuum; and, therefore, it is critical that information flow from all of your divisions and operations be fed into the risk management team.

- **AMZ MANAGEMENT, LLC** may terminate the Services of **UIC, Inc.** immediately if **UIC, Inc.**:

  a. Has engaged in willful misconduct, fraud or gross negligence in the performance of the services outline in this document;

  b. Is in breach of any of the terms of its agreement as set out in this document and fails to remedy the breach within "thirty" days of being requested in writing to do so;

  OR

  c. Goes into liquidation or makes a composition or arrangement with its creditors generally or takes advantages of any statute for the relief of insolvent debtors.

## CONFIDENTIALITY

**UIC, Inc.** will maintain in strict confidence all information shared with it by **AMZ MANAGEMENT, LLC** or obtained in the course of its engagement hereunder, and will not disclose or use any such information except to insurance companies, brokers, and related entities ("Insurance Related Entities") in the course of the services being performed for **AMZ MANAGEMENT, LLC.**

## TERMS OF ENGAGEMENT

**UIC, Inc** will be retained for an initial period of twelve (12) months.

## KEY PERSONNEL ASSIGNED

During the engagement of **UIC, Inc.**, barring sickness, disability or death, **UIC, Inc.** will provide the services of Thomas A. Kovatch, John T. Negrotto, and Joe Perez and other senior associates to **AMZ MANAGEMENT, LLC** as the lead consultant for such aspects of the services as **AMZ MANAGEMENT, LLC** from time to time requires.

## DIRECTION BY AMZ MANAGEMENT, LLC

**UIC, Inc.** must comply with all responsible policies and directions of **AMZ MANAGEMENT, LLC** and any nominee of same as notified as respects **AMZ MANAGEMENT, LLC's** insurance or risk management program, providing, always, that such direction will not professionally compromise **UIC, Inc.** in its professional capacity.

## OWNERSHIP OF CONTRACT MATERIAL

**UIC, Inc.** maintains ownership of all intellectual properties provided to **AMZ MANAGEMENT, LLC** We acknowledge any source documents provided by **AMZ MANAGEMENT, LLC** and the furtherance of this agreement will remain the property of **AMZ MANAGEMENT, LLC.**

## RELATIONSHIP

This document does not create a relationship of employee, agency, or partnership between the parties. **UIC, Inc.** has no right to bind in contract or otherwise **AMZ MANAGEMENT, LLC** and must not represent that it has that right.

## LIMITATION OF LIABILITY / INDEMNIFICATION

**UIC, Inc.'s** maximum liability relating to services rendered under the attached letter (regardless of the form of action, whether in contract, negligence or otherwise) shall be limited to two (2) times the annual charges paid to **UIC, Inc.** In no event shall **UIC, Inc.** be liable for consequential, special, incidental or punitive loss, damage or expense

3

(including, without limitation: loss of profits, opportunity costs, etc.) even if it has been advised of their possible existence.

AMZ MANAGEMENT, LLC shall indemnify and hold harmless UIC, Inc. and its personnel from and against any claims, liabilities, costs and expenses arising out of or relating to the services rendered under this letter, except to the extent finally determined to have resulted from the gross negligence or willful misconduct of UIC, Inc. personnel.

The provisions of the preceding paragraphs shall survive the termination of this agreement.

## FEES AND EXPENSES

Our fee for the services being provided is as follows:

- An annual fee of $15,000, billable at $3,750 per quarter

- The annual fees are all-inclusive except travel and related costs as we do not charge extra for photocopies or domestic phone calls to "North America". Local travel within a 100 mile radius is included in the fee structure. Any travel expenses will be billed separately and will be on an out-of-pocket basis. It is our policy to travel coach domestically and Business Class in all other cases where flight times exceed five (5) hours. All travel expenses are due upon presentation. We will split travel amongst all clients visited on the most appropriate basis when we visit more than one client.

We appreciate the opportunity to be of service to you and believe this engagement letter accurately summarizes the terms of our engagement. If the foregoing is in accordance with your understanding, please sign the enclosed copy and return to us. This letter will continue in effect and be continuously renewed until cancelled by either party at the initial term identified in this letter.

Very truly yours,
UIC, Inc.

Thomas A. Kovatch, President

4

This document is hereby signed by an authorized representative of **AMZ MANAGEMENT, LLC** on behalf of all of the **AMZ MANAGEMENT, LLC** companies, which shall be part of the risk management program.

**AMZ MANAGEMENT, LLC**

_____

Zachary Cohen, President / CEO

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

| | |
|---|---|
| OLD BETH II, LLC, | **SUMMONS** |
| Plaintiff, | Index No.: |
| -against- | **PLACE OF TRIAL**<br>Nassau County |
| UIC, INC., a/k/a UNITED INSURANCE CONSULTANTS, INC., JOSEPH PEREZ, | **BASIS OF VENUE**<br>CPLR § 503 |
| Defendants. | |

TO THE ABOVE-NAMED DEFENDANTS, located at:

UIC, INC., a/k/a UNITED INSURANCE CONSULTANTS, INC.,
1 Park Way, Unit B
Upper Saddle River, New Jersey 07458

JOSEPH PEREZ
1 Park Way, Unit B
Upper Saddle River, New Jersey 07458

**YOU ARE HEREBY SUMMONED** to answer the Verified Complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorneys within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: Richmond, Virginia
January 10, 2023

WHITEFORD, TAYLOR & PRESTON LLP

By: _____
Stephen M. Faraci, Sr.

Stephen Faraci, Sr. (NYS Bar No. 5052501)
444 Madison Avenue, 4th Floor
New York, NY 10022
 and
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219

(804) 977-3300
sfaraci@wtplaw.com

Albert J. Mezzanotte (*pro hac vice application forthcoming*)
Aaron A. Nichols (*pro hac vice application forthcoming*)
Seven Saint Paul Street, Suite 1500
Baltimore, Maryland 21202
(410) 347-8700
amezzanotte@wtplaw.com
pnussbaum@wtplaw.com
anichols@wtplaw.com

*Attorneys for Plaintiff Old Beth II, LLC*

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---

OLD BETH II, LLC,

          Plaintiff,

      -against-

UIC, INC., a/k/a UNITED INSURANCE CONSULTANTS, INC.,
JOSEPH PEREZ,

          Defendants.

Index No.:

Jury Trial Demanded

**VERIFIED COMPLAINT**

---

Plaintiff OLD BETH II, LLC ("Plaintiff" or "Old Beth"), through its undersigned counsel, files this Complaint against Defendants UIC, Inc., *a/k/a.* UNITED INSURANCE CONSULTANTS, INC. ("UIC") and JOSEPH PEREZ ("PEREZ" and, collectively with UIC, "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1. Defendants were retained and trusted as Plaintiff's sole insurance procurement experts and consultants. Defendants were specifically directed by Plaintiff to obtain certain insurance for Plaintiff's property in order to secure coverage for tort claims related to conditions on the property. Defendants provided Plaintiff with every assurance that such coverage would be secured for its property. In reality, Defendants failed to take any reasonable action to secure the coverage for Plaintiff and, instead, affirmatively misled Plaintiff to believe its property was adequately insured. It was not until after Plaintiff was sued in a tort action that it discovered the fact that Defendants misled and wholly failed to undertake their duties owed to Plaintiff, thus, leaving Plaintiff without insurance coverage to defend the tort action and/or to provide coverage to Plaintiff in the event of a settlement or an adverse result at trial.

2.     This action is brought to recover damages sustained by Plaintiff as a result of Defendants' failure to seek and procure general liability coverage for Plaintiff.

## THE PARTIES

3.     Old Beth is a limited liability company organized and existing under the laws of the State of New York, with its only assets and real property located in Nassau County, New York. Old Beth is an affiliated real estate company to and managed by AMZ Management, LLC ("AMZ"). Old Beth exclusively operates in the State of New York, Nassau County.

4.     Defendant UIC is a corporation organized and existing under the laws of the State of New Jersey, with its principal executive office located at 1 Park Way, Upper Saddle River, New Jersey 07458. At all times relevant hereto, UIC is and was engaged in the business of providing broad insurance procurement and consulting services to parties seeking insurance solutions and coverage, including to Old Beth. UIC is registered to conduct business in the State of New York and has been since, at least, 2008.

5.     Upon information and belief, Defendant Perez is a resident of Jersey City, New Jersey. Perez, at all times relevant to the allegations of this Complaint, was employed by UIC to assist UIC with the provision of services to Old Beth as an experienced and skilled insurance procurement specialist and consultant.

## JURISDICTION AND VENUE

6.     Jurisdiction over the subject matter of this action exists pursuant to CPLR § 301.

7.     This Court has jurisdiction over Defendants pursuant to CPLR § 302 and the common law of New York as UIC and Perez regularly and systemically conduct business in New York and otherwise have sufficient minimum contacts with New York to render the exercise of jurisdiction by this Court consistent with traditional notions of fair play and substantial justice.

2

Indeed, UIC has been registered to conduct business in New York since, at least, 2008. The allegations contained herein further support this Court's jurisdiction. Old Beth's property at issue—for which Defendants failed to properly obtain material and basic insurance coverage—is located in this jurisdiction. Thus, the harm and Defendants' overt and injurious causing acts, as alleged herein, all occurred in this jurisdiction. The services rendered by UIC and Perez were for the benefit of Old Beth, a New York entity. Moreover, Defendants regularly communicated with representatives of Old Beth in New York.

8.     Venue properly lies within this judicial district pursuant to CPLR § 503 due to the residence of Old Beth and, as alleged herein, this judicial district is the location of the alleged harm and where the causes of action arose.

## FACTS COMMON TO ALL COUNTS

### The Relationship Between the Parties

9.     Plaintiff incorporates by reference all allegations of this Complaint as if fully restated herein.

10.     Old Beth is the owner of the property located at 501 Winding Road, Old Bethpage, New York 11804 (the "Old Beth II Property"). Old Beth purchased the Old Beth II Property in or about August 2007.[1]

11.     At all times relevant to the allegations of this Complaint, and for many years prior to the events alleged herein, AMZ, for the direct benefit of Old Beth and certain other affiliates,

---

[1]     On September 24, 2005, the prior owners of the Old Beth II Property (Winding Road Properties, Inc. and Winding Road Estates, Inc.) filed voluntary petitions for bankruptcy, pursuant to Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the Eastern District of New York. On August 17, 2007, the Bankruptcy Court entered an *Order Authorizing the Debtor to Sell and Transfer Its Premises Located at 501 Winding Road, Old Bethpage, New York* (the "Sale Order"). Plaintiff's purchase of the Old Beth II Property under the Sale Order occurred pursuant to 11 U.S.C. § 363(f).

3

retained UIC to be its trusted insurance consultant and procurement adviser, to make sure that the properties under AMZ's management, including the Old Beth II Property, were insured for all matters, including liability insurance coverage.

12.     AMZ and Old Beth had a long-standing relationship with UIC that was reflected in valid and binding contracts, the most recent and pertinent of which was titled Engagement Letter for UIC, Inc. Services (the "Contract").   A true and accurate copy of the Contract is attached hereto as **Exhibit 1**.

13.     The Contract provided that UIC will provide various services to AMZ and Old Beth. Defendants were responsible for ensuring that properties managed by AMZ, including the Old Beth II Property, were fully insured and protected to the fullest extent possible, including for claims of bodily injury and property damage arising from hazardous materials releases. Defendants were responsible for recommending coverage, obtaining coverage, communicating with brokers and insurance companies to obtain coverage, and, among other roles, ensuring that AMZ managed properties, including the Old Beth II Property, were insured to the fullest extent possible.

14.     Specifically, and relevant to the instant dispute, the Contract stated that UIC will:

- Assist in setting the strategic risk management goals for AMZ MANAGEMENT, LLC and the steps to implement same to achieve these goals.

- Assist in the gathering of information on exposures, values, claims and losses. This information shall provide the proper "risk profile" for AMZ MANAGEMENT, LLC for the purposes of this document; AMZ MANAGEMENT, LLC shall mean AMZ MANAGEMENT, LLC and all of its subsidiary companies and affiliated real estate companies that it manages.

- We will review all available loss data for the major coverages, i.e., Property, General Liability, Workers Compensation, Auto, Umbrella, Pollution, Professional Liability, Cyber, Liability, and Directors & Officers Liability

4

to present in the most favorable light to the insurance community while internally using it as a risk management tool and to reduce exposures when possible.

- Based on the above steps, we will work together with AMZ MANAGEMENT, LLC's risk management team to develop appropriate underwriting information for targeted areas of coverage.

\* \* \*

- UIC, Inc. will negotiate with brokers and direct writing insurers, including reinsurers if required, using our technical abilities and marketing knowledge to achieve a comprehensive program as directed by AMZ MANAGEMENT, LLC.

*See* Ex 1.

### The Policy

15. Old Beth, along with several other corporate entities owning properties managed by AMZ, is a "Named Insured" on an Ironshore Specialty Insurance Company Site Pollution Incident Legal Liability Select policy ("the Policy").

16. The effective dates of the Policy were May 24, 2019, to May 24, 2022.

17. The Policy provided its insureds with reimbursement for remediation expenses for pollution cleanup ("Cleanup Costs") and third party claims for bodily injury and property damage ("Tort Claims") arising from qualifying pollution events at a property covered under the policy ("Covered Properties").

18. The address of the Covered Properties must be listed on the "Schedule of Covered Properties" under the policy as a necessary requirement for a claim by a Named Insured related to a Covered Property to be covered under the Policy.

19. As discussed in greater detailed below, the address of the Old Beth II Property, however, was never listed on the "Schedule of Covered Properties" under the Policy.

20. The Policy includes an Endorsement for "Specified Conditions Exclusions" (Endorsement # 22, the "Pollution Endorsement"). The Pollution Endorsement is a carve out for

5

specific pollution events at AMZ managed properties that were excluded from Cleanup Cost coverage for known pre-existing pollution events ("Pre-Existing Conditions") at Covered Properties, but were able to receive coverage for Tort Claims arising from Pre-Existing Conditions at the Covered Property or beyond the boundaries of the Covered Properties. Stated differently, due to known Pre-Existing Conditions that arose before the Policy's effective date, Ironshore was not willing to provide Cleanup Cost coverage for pollution Cleanup Costs at certain Covered Properties; Ironshore, however, was willing to provide coverage, under the Pollution Endorsement, for Tort Claims that may arise out of the same Pre-Existing Conditions where coverage for Cleanup Costs was expressly excluded from coverage because it was known to exist before the Policy's effective date.

21. There were two Covered Properties listed on the Pollution Endorsement coverage exclusions for Cleanup Costs arising from Pre-Existing Conditions, but expressly have coverage for Tort Claims arising from those same Pre-Existing Conditions, namely 1311 Union Avenue in West Springfield, MA and 110 Sodom Road in Milton, PA.

**The Old Beth II Property**

22. The Old Beth II Property was not listed as a covered property on the Pollution Endorsement.

23. An insurance procurement consultant and representative, such as Defendants, of ordinary skill would have known that the Old Beth II Property should have been added to the "Schedule of Covered Properties" under the Policy because Defendants had all necessary information to ensure it was covered along with numerous other AMZ managed properties. Indeed, Defendants properly listed **58 other properties** on the "Schedule of Covered Properties." In short, given the amount at stake, a competent insurance procurement expert and consultant

6

would not have intentionally or negligently excluded the Old Beth II Property for the "Schedule of Covered Properties."

24.     Indeed, had Defendants undertaken a minimum amount of diligence, as is required by such insurance procurement experts and consultants, they would have unilaterally known that the Old Beth Property was left off the "Schedule of Covered Properties" and would have fixed the error without prompting from Old Beth.

25.     Despite the fact that Defendants, in their role as insurance procurement experts and consultants, should have unilaterally acted to ensure coverage, Old Beth requested numerous times that the address of the Old Beth II Property be added to the Policy's "Schedule of Covered Properties."

26.     Old Beth repeatedly made clear to Defendants that it sought to obtain insurance coverage for the Old Beth II Property through Defendants. Or, at a minimum, had such insurance been requested and subsequently denied by Ironshore, Old Beth would have sought coverage for Tort Claims through the Pollution Endorsement, as was provided for two other properties managed by AMZ.

27.     On February 7, 2020, AMZ's Chief Financial Officer, Matthew Lomuti ("Lomuti"), emailed Perez and asked him to "[c]onfirm that Winding Road address [the Old Beth II Property] is on both the Property and Pollution policies," *i.e.,* the Policy.

28.     On March 9, 2020, Lomuti again emailed Perez advising him that a list of properties for liability insurance coverage used by Defendants was not updated to include the Old Beth II Property.

7

29.     On March 19, 2020, Lomuti emailed Perez and included a chart with an updated list of properties for which Old Beth sought to procure liability insurance coverage. Consistent with prior communications and intentions, included on this list was the Old Beth II Property.

30.     On April 17, 2020, Perez provided Lomuti copies of the Policy, including the list of properties on the "Schedule of Covered Properties" and the properties listed on the Pollution Endorsement, making no mention of any reasoning as to why the Old Beth II Property was not included on the Policy or expressing any concern as to the availability of coverage for the Old Beth II Property.

31.     Still having failed to add the Old Beth Property II to the Policy (or the Pollution Endorsement), Lomuti, on May 26, 2020, again emailed Perez and attached a copy of the then-current version of the "Schedule of Covered Properties." Therein, Old Beth hand wrote instructions for Perez to add the Old Beth II Property to the Policy.

32.     Defendants through various phone conversations at or around this time, in turn, assured Old Beth that they would procure the insurance coverage sought by Old Beth or, at the very least, that reasonable efforts would be made to attempt to procure such coverage of the Old Beth II Property.

33.     With this understanding, Old Beth was never contacted by Defendants regarding failed efforts to obtain insurance coverage or denials from brokers or insurance companies for the Old Beth II Property. Accordingly, Old Beth was, at all times relevant, under the impression, based on omissions and representations made by Defendants that the Old Beth II Property was added to the "Schedule of Covered Properties."

8

34.     As further explained below, the Village of Farmingdale, New York initiated a law suit against Old Beth on July 20, 2020, for Tort Claims arising from historic pollution at the Old Beth II Property that pre-dated Old Beth's ownership of it.

35.     On September 15, 2020, Lomuti emailed Perez asking: "Winding Road was added to both the property and pollution policies [the Pollution Endorsement] when we discussed it several months ago, correct?"

36.     On September 17, 2020, Lomuti emailed Perez, again ensuring that the Old Beth II Property was covered by its liability insurance policy: "Any updates on the property insurance? Also we want to confirm that Winding Road [the Old Beth II Property] was added to both the property and pollution policies [the Pollution Endorsement]."

37.     In an effort to conceal his reckless conduct and gross negligence and intentional acts and omissions, Perez emailed on September 17, 2020 and stated that "501 Winding [R]oad… is not a covered location on the pollution policy because of the historical pollution issues there." There was no indication from Perez that he took any reasonable efforts to add the Old Beth II Property to the Policy or, in the event of an actual rejection, that he attempted to add the property to the Pollution Endorsement.

38.     On September 22, 2020, Perez nevertheless emailed Lomuti requesting any environmental site assessment reports for the Old Beth II Property, as would be required for Ironshore to conduct its initial underwriting of the Old Beth II Property as a Covered Location. Lomuti promptly responded and attached the requested information later that same day.

39.     On September 28, 2020, Lomuti again emailed Perez asking: "Did you speak with the Broker/Insurer about [the Old Beth II Property]?" Perez responded as follows: "Yes and I sent him the [Old Beth II Property environmental site assessment report]. As I previously mentioned,

9

the insurer may decide to cover the location, but likely will limit coverage to new conditions and exclude pre-existing conditions."

40. Despite Old Beth's repeated and continuous requests, Defendants' clear knowledge that Old Beth sought to procure coverage for the Old Beth II Property, Defendants' assurances that it would procure such coverage, and Defendants' failure to inform Old Beth that it failed to obtain any coverage for the Old Beth II Property, Defendants failed to obtain liability insurance for the Old Beth II Property under the Policy or, at the very least, the Pollution Endorsement.

41. Defendants, pursuant to the terms of the Contract, undertook responsibility for ensuring that the Old Beth II Property was insured. The Old Beth II Property, however, was not listed as a "Schedule of Covered Properties," nor was it, at a minimum, listed as a covered property under the Pollution Endorsement.

**Tort Claims Against Old Beth II**

42. Defendants' failure to obtain any insurance coverage for the Old Beth II Property came to light on or about July 27, 2020, when Old Beth was named as a defendant in an environmental-contamination tort lawsuit filed in the Supreme Court of the State of New York, County of Nassau (the "Underlying Action"), by the Village of Farmingdale, an incorporated village located in the Town of Oyster Bay in Nassau County, New York. In the Underlying Action, styled *Village of Farmingdale v. ALJO-GEFA Precision Manufacturing, LLC, et al.*, Index No. 607613/2020,[2] the Village of Farmingdale essentially alleges that a host of defendants (including Old Beth) are responsible for contamination of the Village of Farmingdale's drinking water,

---

[2]     On or about September 2, 2021, the Court consolidated Index No. 607613/2020 with another case pending in the Supreme Court of Nassau County styled, *Village of Farmingdale v. Aluminum Louvre Corp.*, Index No. 603443/2019. Due to this consolidation, Index No. 607613/2020 is proceeding with the court under Index No. 603443/2019.

10

causing injury to a class of plaintiffs. To be sure, the Underlying Action is a third-party action for Tort Claims filed against Old Beth and other defendants. With regard to Old Beth, the Underlying Action relates to the Old Beth II Property.

43.    Had the Old Beth II Property been listed on "Schedule of Covered Properties" or as a covered property under the Pollution Endorsement, Old Beth would have been entitled to insurance coverage for the Underlying Action.

44.    The lack of insurance leaves Old Beth uncovered for the liabilities associated with the Underlying Action including costs, expenses, attorneys' fees, and potential damages stemming from the Underlying Action that otherwise would have been covered had Defendants not acted intentionally, grossly and recklessly in failing to procure essential insurance coverage. It is these damages Old Beth seeks to recover through this instant action.

45.    Defendants' failure to come clean and admit its fault further caused injury to Old Beth because it prohibited Old Beth from seeking essential insurance coverage by other means prior to the filing of the Underlying Action. Instead, Old Beth was led to believe that Defendants acted to ensure that the Old Beth II Property was listed on the "Schedule of Covered Properties" and that it was protected from Tort Claims, such as the Underlying Action.

46.    Confirming the intentional, grossly negligent and reckless nature of Defendants' failures, Perez, during a September 28, 2020 call with Old Beth, confirmed that he "dropped the ball" with respect to procuring coverage for the Old Beth II Property.

47.    Further demonstrating the egregious nature of Defendants' acts and omissions, after the Underlying Action was filed, Defendants learned that Ironshore, the insurance underwriter, would have secured for the Old Beth II Property "new conditions coverage," *e.g.*, coverage for new third-party tort claims. Or, like with two other AMZ-managed properties, Tort Claims

11

coverage under the Pollution Endorsement. Ironshore confirmed Defendants' improper acts and omissions by noting that the Old Beth II Property "was never scheduled on the policy and therefore there is no coverage currently."

48.      Defendants' failure to acquire for Old Beth basic but essential insurance coverage—despite repeated requests and assurances from Defendants that such coverage would be procured—has caused and will continue to cause significant injury to Old Beth as the Underlying Action is ongoing.

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
### (*OLD BETH VS. UIC*)

49.      Plaintiff incorporates each of the allegations of this Complaint as if as if fully restated herein.

50.      Plaintiff and UIC entered into a valid and binding contract—the Contract—pursuant to which UIC was obligated to procure liability insurance coverage for the Old Beth II Property, including, if necessary, coverage under the Pollution Endorsement.

51.      Pursuant to the Contract, and as affirmed by actions undertaken by UIC during the scope of its engagement with Old Beth, UIC, through, among others, Perez, agreed that it would procure insurance coverage for the Old Beth II Property.

52.      Old Beth performed its contractual obligations in the form of payment to UIC for its services.

53.      UIC breached the Contract by, among other things, failing to procure the insurance coverage sought by Old Beth and promised by UIC.

54.      UIC further breached the Contract by failing to inform Old Beth that it undertook no action to procure such insurance, leaving Old Beth to believe that its property was covered

12

under the Policy. It was not until after the Underlying Action was instituted that Old Beth learned of UIC's failures.

55.     As a result of UIC's breach, Old Beth has suffered identifiable and reasonably foreseeable damages. The damages suffered by Old Beth are directly and proximately caused by UIC's breach of contract. UIC knew and understood that by not procuring the insurance coverage requested by Old Beth that it was leaving Old Beth susceptible to a gap in insurance coverage, exposing Old Beth to potential liability, without appropriate insurance coverage. Further, by failing to notify Old Beth that it failed to undertake any action to procure such insurance coverage, UIC left Old Beth with no opportunity to seek coverage elsewhere, negotiate with Ironshore to have the Old Beth II Property added to the Pollution Endorsement (like two other AMZ managed properties), or mitigate risks associated with the Old Beth II Property by other means. As the Underlying Action would have been covered by the Policy and/or the Pollution Endorsement, it is clear that UIC's breach of contract caused Old Beth's damages.

WHEREFORE, Old Beth prays for judgment against UIC in an amount to be determined at trial, but not less than all fees, costs, including attorneys' fees and costs, penalties, settlement payment(s), or judgment incurred as a result of the Underlying Action, plus interest thereon at the legal rate, as well as all costs incurred by Old Beth in presenting and prosecuting the claims asserted herein, including reasonable attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION
### GROSS NEGLIGENCE
### (*OLD BETH V. UIC & PEREZ*)

56.     Plaintiff incorporates each of the allegations of this Complaint as if as if fully restated herein.

13

57.     Based upon Defendants' representations that they possessed the expertise, experience, and skill to provide Old Beth reasonable insurance coverage, Old Beth placed significant trust and confidence in Defendants. Indeed, UIC represents that it possesses "Industry-Leading Expertise" and that it "[e]xists to guide [its] clients through the vagaries of the risk management and insurance procurement process." Specifically, UIC represents that it has "extensive knowledge of placing and managing significant deductible liability policies and first-party property and marine coverages."

58.     Defendants owed Old Beth a duty to perform professional services in connection with Defendants' insurance consulting business. Defendants undertook responsibilities and were trusted to provide Old Beth with a level of service and care consistent with industry standards.

59.     Defendant knew that Old Beth was placing its trust and confidence in Defendants based upon representations made by Defendants' as to their expertise, experience, and skill. Old Beth reasonably relied upon Defendants to procure the basic, but material, coverage under the Policy or, at the very least, the Pollution Endorsement, based on its express statements that it would add the Old Beth II Property to the Policy. As such, Defendants knew that Old Beth was relying upon Defendants to perform the professional services they had a duty to perform.

60.     Defendants grossly and recklessly breached the standard of care by failing to initially identify the fact that the Old Beth II Property was left off of the "Schedule of Covered Properties" under the Policy. Industry standards mandate that professionals like Defendants employ reasonable efforts to ensure all requested coverage is obtained, including by cross-referencing named insureds and their respective properties are covered under applicable policies. The fact that Defendants failed to identify this mistake and remedy it, constitutes conduct that falls

14

well-below the standard of care. Instead, Old Beth caught the mistake and was forced to repeatedly request that the Old Beth II Property be added to the Policy.

61.    Even still, Defendants expressly confirmed that it was undertaking the necessary steps to procure for Old Beth insurance coverage under the Policy, which would have provided coverage for third-party tort claims, such as the Underlying Action. But, in actuality, it did not. This represents a gross and reckless departure from the standard of care applicable to Defendants and other professionals in their industry.

62.    Further evidencing recklessness and gross negligence, Defendants failed to properly inform Old Beth that it undertook no action to procure insurance coverage for the Old Beth II Property. Had Old Beth known that the Old Beth II Property was not added to the "Schedule of Covered Properties" or that Ironshore rejected the addition to the Policy due to pre-existing conditions, it could have obtained coverage for third-party tort actions, such as the Underlying Action. But Defendants failed take such reasonable and industry standard actions and, thus, precluded Old Beth from the opportunity of obtaining essential insurance coverage.

63.    At a minimum, and in the event that Ironshore did reject coverage under the Policy, Defendants should have made every reasonable effort to add the Old Beth II Property to the Pollution Endorsement—*as was obtained for two other AMZ-managed properties*. Defendants failure to, at a minimum, obtain the same insurance coverage that was provided to similarly situated AMZ-managed properties, was a gross departure from the standard of care applicable to Defendants and other professionals in their industry.

64.    Instead, Defendants failed to inform Old Beth of its utter failure to take any action to procure any level of insurance for the Old Beth II Property and left Old Beth with no opportunity to seek coverage elsewhere, negotiate with Ironshore to have the Old Beth II Property added to the

15

Pollution Endorsement (like two other AMZ managed properties), or mitigate risks associated with the Old Beth II Property by other means.

65.     Defendants owed a duty of care to Old Beth to act as a reasonably competent insurance advisor, consultant and procurer and exercise reasonable skill, care, and diligence in the execution of the services that Defendants were entrusted to perform, including procuring liability insurance coverage for the Old Beth II Property under the Policy or, at the very least, under the Pollution Endorsement. Defendants owed Old Beth the duty to procure the requested coverage in a reasonable period of time and, in the event Defendants were unable to procure such coverage, Defendants had a duty to advise or direct Old Beth as to those circumstances.

66.     Such failures constitute gross departures from the standard of care applicable to brokers and consultants in this industry, including those applicable to Defendants.

67.     As a result of Defendants' breaches of the standard of care, Plaintiff has suffered, and continues to suffer, identifiable and reasonably foreseeable damages. The damages suffered by Plaintiffs were directly and proximately caused by Defendants' breach of duties owed to Old Beth.

WHEREFORE, Old Beth prays for judgment against UIC in an amount to be determined at trial, but not less than all fees, costs, including attorneys' fees and costs, penalties, settlement payment(s), or judgment incurred as a result of the Underlying Action, plus interest thereon at the legal rate, as well as all costs incurred by Old Beth in presenting and prosecuting the claims asserted herein, including reasonable attorneys' fees and costs, punitive damages, and such other and further relief as the Court deems just and proper.

16

### THIRD CAUSE OF ACTION
#### NEGLIGENCE
### (*OLD BETH V. UIC & PEREZ*)

68. Plaintiff incorporates each of the allegations of this Complaint as if as if fully restated herein.

69. Based upon Defendants' representations that they possessed the expertise, experience, and skill to provide Old Beth reasonable insurance coverage, Old Beth placed significant trust and confidence in Defendants. Indeed, UIC represents that it possesses "Industry-Leading Expertise" and that it "[e]xists to guide [its] clients through the vagaries of the risk management and insurance procurement process." Specifically, UIC represents that it has "extensive knowledge of placing and managing significant deductible liability policies and first-party property and marine coverages."

70. Defendants owed Old Beth a duty to perform professional services in connection with Defendants' insurance consulting business. Defendants undertook responsibilities and were trusted to provide Old Beth with a level of service consistent with industry standards.

71. Defendant knew that Old Beth was placing its trust and confidence in Defendants based upon representations made by Defendants' as to their expertise, experience, and skill. Old Beth reasonably relied upon Defendants to procure the basic, but material, coverage under the Policy or, at the very least, the Pollution Endorsement, based on its express statements that it would add the Old Beth II Property to the Policy. As such, Defendants knew that Old Beth was relying upon Defendants to perform the professional services they had a duty to perform.

72. Defendants breached the standard of care by failing to initially identify the fact that the Old Beth II Property was left off of the "Schedule of Covered Properties" under the Policy. Industry standards mandate that professionals like Defendants employ reasonable efforts to ensure

17

all requested coverage is obtained, including by cross-referencing named insureds and their respective properties are covered under applicable policies. The fact that Defendants failed to identify this mistake and remedy it, constitutes conduct that falls well-below the standard of care. Instead, Old Beth caught the mistake and was forced to repeatedly request that the Old Beth II Property be added to the Policy.

73.     Even still, Defendants expressly confirmed that it was undertaking the necessary steps to procure for Old Beth insurance coverage under the Policy, which would have provided coverage for third-party tort claims, such as the Underlying Action. But, in actuality, it did not.

74.     Moreover, Defendants failed to properly inform Old Beth that it undertook no action to procure insurance coverage for the Old Beth II Property. Had Old Beth known that the Old Beth II Property was not added to the "Schedule of Covered Properties" or that Ironshore rejected the addition to the Policy due to pre-existing conditions, it could have obtained coverage for third-party tort actions, such as the Underlying Action. But Defendants failed take such reasonable and industry standard actions and, thus, precluded Old Beth from the opportunity of obtaining essential insurance coverage.

75.     At a minimum, and in the event that Ironshore did reject coverage under the Policy, Defendants should have made every reasonable effort to add the Old Beth II Property to the Pollution Endorsement—*as was obtained for two other AMZ-managed properties*. Defendants failure to, at a minimum, obtain the same insurance coverage that was provided to similarly situated AMZ-managed properties, was a gross departure from the standard of care applicable to Defendants and other professionals in their industry.

76.     Instead, Defendants failed to inform Old Beth of its utter failure to take any action to procure any level of insurance for the Old Beth II Property and left Old Beth with no opportunity

18

INDEX NO. 600542/2023

RECEIVED NYSCEF: 01/10/2023

to seek coverage elsewhere, negotiate with Ironshore to have the Old Beth II Property added to the Pollution Endorsement (like two other AMZ managed properties), or mitigate risks associated with the Old Beth II Property by other means.

77.     Defendants owed a duty of care to Old Beth to act as a reasonably competent insurance advisor, consultant and procurer and exercise reasonable skill, care, and diligence in the execution of the services that Defendants were entrusted to perform, including procuring liability insurance coverage for the Old Beth II Property under the Policy or, at the very least, under the Pollution Endorsement. Defendants owed Old Beth the duty to procure the requested coverage in a reasonable period of time and, in the event Defendants were unable to procure such coverage, Defendants had a duty to advise or direct Old Beth as to those circumstances.

78.     Such failures constitute gross departures from the standard of care applicable to brokers and consultants in this industry, including those applicable to Defendants.

79.     As a result of Defendants' breaches of the standard of care, Plaintiff has suffered, and continues to suffer, identifiable and reasonably foreseeable damages. The damages suffered by Plaintiffs were directly and proximately caused by Defendants' breach of duties owed to Old Beth.

WHEREFORE, Old Beth prays for judgment against UIC in an amount to be determined at trial, but not less than all fees, costs, including attorneys' fees and costs, penalties, settlement payment(s), or judgment incurred as a result of the Underlying Action, plus interest thereon at the legal rate, as well as all costs incurred by Old Beth in presenting and prosecuting the claims asserted herein, including reasonable attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

19

## FOURTH CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
### (*OLD BETH V. UIC & PEREZ*)

80.     Plaintiff incorporates each of the allegations of this Complaint as if as if fully restated herein.

81.     UIC and Perez, as Old Beth's long-time insurance consultant, owed fiduciary duties and obligations to Old Beth knowing that it was placing its total trust and reliance upon Defendants' representations and undertaking of the responsibility to provide Old Beth with adequate and essential insurance procurement services, in a timely manner, and keep Old Beth reasonably informed.  Old Beth sought the expertise of Defendants as its trusted advisor and, accordingly, Defendants were under a duty to act for and give advice to Old Beth on matters within the scope of their relationship.

82.     Defendants' fiduciary duties included the obligation to act prudently, in good faith, and in the best interest of Old Beth with respect to the insurance coverage for which Plaintiffs retained Defendants to procure.  Further, Defendants were obligated to keep Old Beth reasonably informed.

83.     As discussed herein, Defendants, through their acts and omissions, breached their fiduciary duties owed to Old Beth by, among other things, failing to identify and remedy the fact that the Old Beth II Property was left off of the "Schedule of Covered Properties," despite the fact that Old Beth specifically requested that it be included, failing to undertake any action after Old Beth informed Defendants of the fact that the Old Beth II Property was negligently left off of the "Schedule of Covered Properties," failing to inform Old Beth of the fact that Defendants undertook no action to actually procure insurance coverage under the Policy for the Old Beth II Property, and, in the event that Ironshore rejected coverage under the Policy, failing to undertake all

20

reasonable efforts to promptly have the Old Beth II Property added to the Pollution Endorsement, like two other AMZ-managed properties. Had Defendants kept Old Beth reasonably informed of its actions and inactions—instead of deliberately leading Old Beth to believe Defendants were diligently undertaking their role as a trusted insurance procurement specialist—it would have been able to seek coverage elsewhere, negotiate with Ironshore to have the Old Beth II Property added to the Pollution Endorsement (like two other AMZ managed properties), or mitigate risks associated with the Old Beth II Property by other means.

84. Defendants knew they failed to obtain coverage for the Old Beth II Property and misled Old Beth into thinking the property was insured so that they could continue to collect payment from Old Beth under the terms of the Contract. Indeed, had Old Beth known of Defendants' intentional acts and omissions, the Contract would have been terminated based on Defendants' conduct.

85. As a result of Defendants' breach of its fiduciary duties owed to Old Beth, Old Beth has suffered, and continues to suffer, identifiable and reasonably foreseeable damages. The damages suffered by Old Beth are the direct and proximate result of Defendants' breach of their fiduciary duty.

WHEREFORE, Old Beth prays for judgment against UIC in an amount to be determined at trial, but not less than all fees, costs, including attorneys' fees and costs, penalties, settlement payment(s), or judgment incurred as a result of the Underlying Action, plus interest thereon at the legal rate, as well as all costs incurred by Old Beth in presenting and prosecuting the claims asserted herein, including reasonable attorneys' fees and costs, punitive damages, and such other and further relief as the Court deems just and proper.

21

### FIFTH CAUSE OF ACTION
#### ACTUAL AND CONSTRUCTIVE FRAUD
#### (*OLD BETH V. UIC & PEREZ*)

86.     Plaintiff incorporates each of the allegations of this Complaint as if as if fully restated herein.

87.     UIC and Perez, as Old Beth's long-time insurance consultant, owed fiduciary duties and obligations to Old Beth knowing that it was placing its total trust and reliance upon Defendants' representations and undertaking of the responsibility to provide Old Beth with adequate and essential insurance procurement services, in a timely manner, and keep Old Beth reasonably informed. Old Beth sought the expertise of Defendants as its trusted advisor and, accordingly, Defendants were under a duty to act for and give advice to Old Beth on matters within the scope of their relationship.

88.     Defendants made certain fraudulent representations and omissions to Old Beth concerning the insurance coverage for the Old Beth II Property. Old Beth specifically requested, on multiple occasions, for Defendant to obtain liability insurance for the Old Beth II Property, and Defendant agreed to obtain the coverage sought by Old Beth.

89.     In truth and fact, Defendants did not procure the liability insurance coverage requested by Old Beth. Instead, and unbeknownst to Old Beth, Defendants undertook no action to reasonably procure insurance coverage for the Old Beth II Property. Not only did Defendants make affirmative representations that the insurance coverage would be acquired for the Old Beth II Property or that Defendants would endeavor and take reasonable efforts to obtain such coverage, Defendants misled Old Beth and withheld the fact that they failed to undertake such action, leaving Old Beth with no opportunity to seek coverage elsewhere, negotiate with Ironshore to have the Old Beth II Property added to the Pollution Endorsement (like two other AMZ managed

22

properties), or mitigate risks associated with the property by other means. Such information was solely in the possession of Defendants and was not provided to Old Beth.

90.     Defendants knew they failed to obtain coverage for the Old Beth II Property and misled Old Beth into thinking the property was insured so that they could continue to collect payment from Old Beth under the terms of the Contract. Indeed, had Old Beth knew of Defendants' intentional acts and omissions, the Contract would have been terminated based on Defendants' conduct.

91.     Plaintiffs, believing in the skill, experience, and honesty of Defendant, relied upon Defendants' misrepresentations and omissions to their detriment. Defendants made the representations and omissions with knowledge of their falsity and with intent to induce Old Beth to rely.

92.     By reason of Defendants' misrepresentations and omissions, which are described in detail above and incorporated herein, Old Beth has suffered, and will continue to suffer, identifiable and reasonably foreseeable damages. The damages suffered by Old Beth are directly and proximately caused by the misrepresentations and omissions of Defendants.

WHEREFORE, Old Beth prays for judgment against UIC in an amount to be determined at trial, but not less than all fees, costs, including attorneys' fees and costs, penalties, settlement payment(s), or judgment incurred as a result of the Underlying Action, plus interest thereon at the legal rate, as well as all costs incurred by Old Beth in presenting and prosecuting the claims asserted herein, including reasonable attorneys' fees and costs, punitive damages, and such other and further relief as the Court deems just and proper.

23

### SIXTH CAUSE OF ACTION
#### NEGLIGENT MISREPRESENTATION
#### (*OLD BETH V. UIC & PEREZ*)

93.     Plaintiff incorporates each of the allegations of this Complaint as if as if fully restated herein.

94.     UIC and Perez, as Old Beth's long-time insurance consultant, owed fiduciary duties and obligations to Old Beth knowing that it was placing its total trust and reliance upon Defendants' representations and undertaking of the responsibility to provide Old Beth with adequate and essential insurance procurement services, in a timely manner, and keep Old Beth reasonably informed. Old Beth sought the expertise of Defendants as its trusted advisor and, accordingly, Defendants were under a duty to act for and give advice to Old Beth on matters within the scope of their relationship.

95.     Defendants, at a minimum, made certain negligent representations and omissions to Old Beth concerning the insurance coverage for the Old Beth II Property. Old Beth specifically requested, on multiple occasions, for Defendant to obtain liability insurance for the Old Beth II Property, and Defendant agreed to obtain the coverage sought by Old Beth.

96.     In truth and fact, Defendants did not procure the liability insurance coverage requested by Old Beth. Instead, and unbeknownst to Old Beth, Defendants undertook no action to reasonably procure insurance coverage for the Old Beth II Property. Not only did Defendants make affirmative representations that the insurance coverage would be acquired for the Old Beth II Property or that Defendants would endeavor and take reasonable efforts to obtain such coverage, Defendants, at a minimum, negligently misled Old Beth and withheld the fact that they failed to undertake such action, leaving Old Beth with no opportunity to seek coverage elsewhere, negotiate with Ironshore to have the Old Beth II Property added to the Pollution Endorsement (like two other

24

AMZ managed properties), or mitigate risks associated with the property by other means. Such information was solely in the possession of Defendants and was not provided to Old Beth.

97.     Defendants knew they failed to obtain coverage for the Old Beth II Property and misled Old Beth into thinking the property was insured so that they could continue to collect payment from Old Beth under the terms of the Contract. Indeed, had Old Beth knew of Defendants' (at a minimum) negligent acts and omissions, the Contract would have been terminated based on Defendants' conduct.

98.     Plaintiffs, believing in the skill, experience, and honesty of Defendant, relied upon Defendants' (at a minimum) negligent misrepresentations and omissions to their detriment. Defendants made the representations and omissions to Old Beth and reasonably knew or should have known of their falsity.

99.     By reason of Defendants' negligent misrepresentations and omissions, which are described in detail above and incorporated herein, Old Beth has suffered, and will continue to suffer, identifiable and reasonably foreseeable damages. The damages suffered by Old Beth are directly and proximately caused by the misrepresentations and omissions of Defendants.

WHEREFORE, Old Beth prays for judgment against UIC in an amount to be determined at trial, but not less than all fees, costs, including attorneys' fees and costs, penalties, settlement payment(s), or judgment incurred as a result of the Underlying Action, plus interest thereon at the legal rate, as well as all costs incurred by Old Beth in presenting and prosecuting the claims asserted herein, including reasonable attorneys' fees and costs, punitive damages, and such other and further relief as the Court deems just and proper.

25

Dated:  Richmond, Virginia
        January 10, 2023

WHITEFORD, TAYLOR & PRESTON LLP

By: _____
     Stephen M. Faraci, Sr.

Stephen M. Faraci, Sr. (NYS Bar No. 5052501)
444 Madison Avenue, 4th Floor
New York, NY 10022
  and
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219
(804) 977-3300
sfaraci@wtplaw.com

Albert J. Mezzanotte (*pro hac vice application forthcoming*)
Aaron A. Nichols (*pro hac vice application forthcoming*)
Seven Saint Paul Street, Suite 1500
Baltimore, Maryland 21202
(410) 347-8700
amezzanotte@wtplaw.com
pnussbaum@wtplaw.com
anichols@wtplaw.com

*Attorneys for Plaintiff Old Beth II, LLC*

26

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---

OLD BETH II, LLC,

         Plaintiff,

  -against-

UIC, INC., a/k/a UNITED INSURANCE CONSULTANTS, INC.,
JOSEPH PEREZ,

         Defendants.

Index No.:

**VERIFICATION**

---

I, Stephen M. Faraci, Sr., am an attorney duly admitted to practice law in the Courts of

this State, and I affirm the following under penalties of perjury:

I am the attorney for the Plaintiff in the above entitled action. I have read the foregoing

VERIFIED COMPLAINT and know the contents thereof, and upon information and belief,

affirmant believes after an inquiry reasonable under the circumstances, the matters alleged herein

to be true, and that the contentions herein are not frivolous, as that term is defined

in 22 NYCRR § 130-1.1(c).

The reason this verification is made by affirmant and not by Plaintiff is that the Plaintiff

herein resides in a County other than the County in which I maintain my offices.

The source of affirmant's information and the grounds of his/her belief are personal

knowledge, communications, papers, reports and investigations contained in the file maintained

by this office.

Dated:  Richmond, Virginia
       January 10, 2023

WHITEFORD, TAYLOR & PRESTON LLP

By: _____
      Stephen M. Faraci, Sr.

Stephen Faraci, Sr. (NYS Bar No. 5052501)
444 Madison Avenue, 4th Floor
New York, NY 10022

and
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219
(804) 977-3300
sfaraci@wtplaw.com

28

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

OLD BETH II, LLC,

        Plaintiff,

   -against-

UIC, INC., a/k/a UNITED INSURANCE CONSULTANTS, INC.,
JOSEPH PEREZ,

        Defendants.

Index No.:

## NOTICE OF ELECTRONIC FILING
### (Mandatory Case)
(Uniform Rule § 202.5-bb)

**You have received this Notice because:**

    1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the
New York State Courts E-filing system ("NYSCEF"), and

    2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
Give this Notice to your attorney. (Attorneys: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney:**
**You will be served with all documents in paper and you must serve and file your
documents in paper, unless you choose to participate in e-filing.**

   **If you choose to participate in e-filing, you must have access to a computer and a
scanner or other device to convert documents into electronic format, a connection to
the internet, and an e-mail address to receive service of documents.**

   The **benefits of participating in e-filing** include:

        - serving and filing your documents electronically

        - free access to view and print your e-filed documents

        - limiting your number of trips to the courthouse

        - paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit: www.nycourts.gov/efile-unrepresented or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court
contact information can be found at www.nycourts.gov

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**
**(E-filing is Mandatory for Attorneys)**

An attorney representing a party who is served with this notice must either:

1) immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile; or

2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov).

Dated: Richmond, Virginia      WHITEFORD, TAYLOR & PRESTON LLP
January 10, 2023

By: */s/ Stephen M. Faraci, Sr.*
     Stephen M. Faraci, Sr.

Stephen Faraci, Sr. (NYS Bar No. 5052501)
444 Madison Avenue, 4th Floor
New York, NY 10022
  and
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219
(804) 977-3300
sfaraci@wtplaw.com

Albert J. Mezzanotte (*pro hac vice application forthcoming*)
Aaron A. Nichols (*pro hac vice application forthcoming*)
Seven Saint Paul Street, Suite 1500
Baltimore, Maryland 21202
(410) 347-8700
amezzanotte@wtplaw.com
pnussbaum@wtplaw.com
anichols@wtplaw.com

*Attorneys for Plaintiff Old Beth II, LLC*

To:

UIC, INC., a/k/a UNITED INSURANCE CONSULTANTS, INC.,
1 Park Way, Unit B
Upper Saddle River, New Jersey 07458

JOSEPH PEREZ
1 Park Way, Unit B
Upper Saddle River, New Jersey 07458

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

OLD BETH II, LLC,

        Plaintiff,

        -against-

UIC, INC., a/k/a UNITED INSURANCE CONSULTANTS,
INC., JOSEPH PEREZ,

        Defendants.

Index No.:

**NOTICE OF APPEARANCE**

PLEASE TAKE NOTICE that Stephen M. Faraci, Sr. of the law firm Whiteford, Taylor &

Preston, LLP hereby appears as counsel in this action on behalf of Plaintiff, and hereby demands

that all further papers in this proceeding be served upon the undersigned at the office address stated

below.

Dated:  Richmond, Virginia
       January 10, 2023

WHITEFORD, TAYLOR & PRESTON LLP

By: _____
      Stephen M. Faraci, Sr.

Stephen Faraci, Sr. (NYS Bar No. 5052501)
444 Madison Avenue, 4th Floor
New York, NY 10022
 and
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219
(804) 977-3300
sfaraci@wtplaw.com

TO:
All counsel of record

# Exhibit 1

## To Verified Complaint

# ENGAGEMENT LETTER FOR UIC, INC. SERVICES

### For AMZ MANAGEMENT, LLC
### For August 1, 2019 until cancelled

**UIC, Inc.** will provide the following services:

- We will audit on a serial basis all insurance policies providing comments and recommendations where applicable. We will evaluate the coverage afforded to the exposures presented and advise accordingly on any significant gaps or materiality issues.

- Review current risk management structure, i.e. retentions-to-premium ratios.

- Assist in setting the strategic risk management goals for **AMZ MANAGEMENT, LLC** and the steps to implement same to achieve these goals.

- Assist in the gathering of information on exposures, values, claims and losses. This information shall provide the proper "risk profile" for **AMZ MANAGEMENT, LLC** for the purposes of this document; **AMZ MANAGEMENT, LLC** shall mean **AMZ MANAGEMENT, LLC** and all of its subsidiary companies and affiliated real estate companies that it manages.

- We will review all available loss data for the major coverages, i.e., Property, General Liability, Workers Compensation, Auto, Umbrella, Pollution, Professional Liability, Cyber, Liability, and Directors & Officers Liability to present in the most favorable light to the insurance community while internally using it as a risk management tool and to reduce exposures when possible.

- Based on the above steps, we will work together with **AMZ MANAGEMENT, LLC's** risk management team to develop appropriate underwriting information for targeted areas of coverage.

- **UIC, Inc.** will prepare insurance specification so that alternative proposals can be solicited as needed and required by **AMZ MANAGEMENT, LLC.**

- **UIC, Inc.** will negotiate with brokers and direct writing insurers, including re-insurers if required, using our technical abilities and marketing knowledge to achieve a comprehensive program as directed by **AMZ MANAGEMENT, LLC.**

- We will analyze all proposals submitted and review them with you and your insurance management team so that you can make informed policy and coverage selections.

- To ensure that **AMZ MANAGEMENT, LLC** is appropriately protected once a proposal is selected, the binders accepted and agreed to by **AMZ MANAGEMENT,**

1

**LLC**, from the brokers and/or direct writers must be comprehensive. This will help to avoid any gray areas in your coverage in the event of an occurrence or claim prior to receiving the policies. We will request binders be produced in accordance with the specifications or accepted proposals.

- Once the insurance policies are issued, **UIC, Inc.** will review and fine-tune them. It is fairly common to find many coverages that are "inadvertently omitted" other than that which has been specifically bound.

- The formation of an insurance "work group" from Operations, Finance, Insurance/HR, Safety and other key positions should be designated to steer the insurance and risk management program. It is critical to **AMZ MANAGEMENT, LLC**'s risk management program that the various operations interface with a risk management team and that the information flow be consistent, accurate and timely so that the insurance/risk management program goals can be achieved and monitored.

- **UIC, Inc.** will review designated key contracts and provide input, along with client counsel, in order to provide the best way to transfer as much risk as possible.

- We will visit you approximately every six (6) to eight (8) weeks, or as agreed, to discuss ways to improve coverages and implement the action plan we have developed with you. We do not work in a vacuum; and, therefore, it is critical that information flow from all of your divisions and operations be fed into the risk management team.

- **AMZ MANAGEMENT, LLC** may terminate the Services of **UIC, Inc.** immediately if **UIC, Inc.**:

  a. Has engaged in willful misconduct, fraud or gross negligence in the performance of the services outline in this document;

  b. Is in breach of any of the terms of its agreement as set out in this document and fails to remedy the breach within "thirty" days of being requested in writing to do so;
  OR
  c. Goes into liquidation or makes a composition or arrangement with its creditors generally or takes advantages of any statute for the relief of insolvent debtors.

## CONFIDENTIALITY

**UIC, Inc.** will maintain in strict confidence all information shared with it by **AMZ MANAGEMENT, LLC** or obtained in the course of its engagement hereunder, and will not disclose or use any such information except to insurance companies, brokers, and related entities ("Insurance Related Entities") in the course of the services being performed for **AMZ MANAGEMENT, LLC**.

## TERMS OF ENGAGEMENT

**UIC, Inc** will be retained for an initial period of twelve (12) months.

## KEY PERSONNEL ASSIGNED

During the engagement of **UIC, Inc.**, barring sickness, disability or death, **UIC, Inc.** will provide the services of Thomas A. Kovatch, John T. Negrotto, and Joe Perez and other senior associates to **AMZ MANAGEMENT, LLC** as the lead consultant for such aspects of the services as **AMZ MANAGEMENT, LLC** from time to time requires.

## DIRECTION BY AMZ MANAGEMENT, LLC

**UIC, Inc.** must comply with all responsible policies and directions of **AMZ MANAGEMENT, LLC** and any nominee of same as notified as respects **AMZ MANAGEMENT, LLC**'s insurance or risk management program, providing, always, that such direction will not professionally compromise **UIC, Inc.** in its professional capacity.

## OWNERSHIP OF CONTRACT MATERIAL

**UIC, Inc.** maintains ownership of all intellectual properties provided to **AMZ MANAGEMENT, LLC** We acknowledge any source documents provided by **AMZ MANAGEMENT, LLC** and the furtherance of this agreement will remain the property of **AMZ MANAGEMENT, LLC.**

## RELATIONSHIP

This document does not create a relationship of employee, agency, or partnership between the parties. **UIC, Inc.** has no right to bind in contract or otherwise **AMZ MANAGEMENT, LLC** and must not represent that it has that right.

## LIMITATION OF LIABILITY / INDEMNIFICATION

**UIC, Inc.**'s maximum liability relating to services rendered under the attached letter (regardless of the form of action, whether in contract, negligence or otherwise) shall be limited to two (2) times the annual charges paid to **UIC, Inc.** In no event shall **UIC, Inc.** be liable for consequential, special, incidental or punitive loss, damage or expense

3

(including, without limitation: loss of profits, opportunity costs, etc.) even if it has been advised of their possible existence.

**AMZ MANAGEMENT, LLC** shall indemnify and hold harmless **UIC, Inc.** and its personnel from and against any claims, liabilities, costs and expenses arising out of or relating to the services rendered under this letter, except to the extent finally determined to have resulted from the gross negligence or willful misconduct of **UIC, Inc.** personnel.

The provisions of the preceding paragraphs shall survive the termination of this agreement.

## FEES AND EXPENSES

Our fee for the services being provided is as follows:

- An annual fee of $15,000, billable at $3,750 per quarter

- The annual fees are all-inclusive except travel and related costs as we do not charge extra for photocopies or domestic phone calls to "North America". Local travel within a 100 mile radius is included in the fee structure. Any travel expenses will be billed separately and will be on an out-of-pocket basis. It is our policy to travel coach domestically and Business Class in all other cases where flight times exceed five (5) hours. All travel expenses are due upon presentation. We will split travel amongst all clients visited on the most appropriate basis when we visit more than one client.

We appreciate the opportunity to be of service to you and believe this engagement letter accurately summarizes the terms of our engagement. If the foregoing is in accordance with your understanding, please sign the enclosed copy and return to us. This letter will continue in effect and be continuously renewed until cancelled by either party at the initial term identified in this letter.

Very truly yours,
**UIC, Inc.**

Thomas A. Kovatch, President

This document is hereby signed by an authorized representative of **AMZ MANAGEMENT, LLC** on behalf of all of the **AMZ MANAGEMENT, LLC** companies, which shall be part of the risk management program.

**AMZ MANAGEMENT, LLC**

Zachary Cohen, President / CEO

# EXHIBIT C

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**

-------------------------------------------------------X

VILLAGE OF FARMINGDALE,

INDEX NO.: _____/2020

                    *Plaintiff,*

**SUMMONS**

  - against -

ALJO-GEFA PRECISION MANUFACTURING, LLC, BARCHILD PROPERTIES LIMITED PARTNERSHIP, 937 CONKLIN STREET ASSOCIATES, LLC, 965 CONKLIN STREET ASSOCIATES, LLC, FAR EAST 668 PROPERTIES LLC, GONZALEZ CHEMICAL CORP., MAYS CHEMICAL COMPANY, OLD BETH II, LLC, QUARTER TO FIVE, INC., SWEET HOLLOW ASSOCIATES, LLC, SWEET HOLLOW REALTY GROUP, LLC, 148 SWEET HOLLOW REALTY, LLC, WDM LLC

                   *Defendants.*

-----------------------------------------------------------X

To the above-named Defendants:

      YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service if complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:  Melville, New York
       July 27, 2020

                            Yours, etc.,

                            **NAPOLI SHKOLNIK PLLC**

                            Lilia Factor, Esq.

Paul J. Napoli, Esq.
Patrick J. Lanciotti, Esq.
400 Broadhollow Road, Suite 305
Melville, New York 11747
Tel: (212) 397-1000
Fax: (646) 843-7603

To:

ALJO-GEFA PRECISION MANUFACTURING, LLC
205 Bethpage Sweet Hollow Rd.
Old Bethpage, New York 11804

BARCHILD PROPERTIES LIMITED PARTNERSHIP
160 Sweet Hollow Road
Old Bethpage, New York 11804

937 CONKLIN STREET ASSOCIATES, LLC
937 Conklin Street
Farmingdale, New York 11735

965 CONKLIN STREET ASSOCIATES, LLC
937 Conklin Street
Farmingdale, New York 11735

FAR EAST 668 PROPERTIES LLC
131-29 Sanford Ave.
Flushing, New York 11355

GONZALEZ CHEMICAL CORP.
605 Albany Ave.
Amityville, New York 11701

MAYS CHEMICAL COMPANY
5611 E. 71st Street
Indianapolis, IN 46220

OLD BETH II, LLC
c/o Todd C. Rubenstein
New England Motor Freight
1-71 North Avenue East
Elizabeth, New Jersey 07201

QUARTER TO FIVE, INC.
40 Robin Lane
Plainview, New York 11803

2

SWEET HOLLOW ASSOCIATES, LLC
205 Bethpage Sweet Hollow Road
Old Bethpage, NY 11804

SWEET HOLLOW REALTY GROUP, LLC
37-18 Railroad Avenue
Long Island City, NY 11101

148 SWEET HOLLOW REALTY, LLC
c/o J & L Properties, LLC
3505 Veterans Memorial Highway
Suite A
Ronkonkoma, New York 11779

 WDM LLC
c/o Wendy Master
140 Half Hollow Road
Dix Hills, New York 11746

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

\----------------------------------------------------------X

VILLAGE OF FARMINGDALE,

INDEX NO.:

Plaintiff,

**VERIFIED COMPLAINT**

- against -

ALJO-GEFA PRECISION MANUFACTURING, LLC, BARCHILD PROPERTIES LIMITED PARTNERSHIP, 937 CONKLIN STREET ASSOCIATES, LLC, 965 CONKLIN STREET ASSOCIATES, LLC, FAR EAST 668 PROPERTIES LLC, GONZALEZ CHEMICAL CORP., MAYS CHEMICAL COMPANY, OLD BETH II, LLC, QUARTER TO FIVE, INC., SWEET HOLLOW ASSOCIATES, LLC, SWEET HOLLOW REALTY GROUP, LLC, 148 SWEET HOLLOW REALTY, LLC, WDM LLC

Defendants.

\----------------------------------------------------------X

Village of Farmingdale, by and through its attorneys, NAPOLI SHKOLNIK PLLC, as and for its Verified Complaint against Defendants ALJO-GEFA PRECISION MANUFACTURING, LLC, BARCHILD PROPERTIES LIMITED PARTNERSHIP, 937 CONKLIN STREET ASSOCIATES, LLC, 965 CONKLIN STREET ASSOCIATES, LLC, FAR EAST 668 PROPERTIES LLC, GONZALEZ CHEMICAL CORP., MAYS CHEMICAL COMPANY, OLD BETH II, LLC, QUARTER TO FIVE, INC., SWEET HOLLOW ASSOCIATES, LLC, SWEET HOLLOW REALTY GROUP, LLC, 148 SWEET HOLLOW REALTY, LLC, and WDM LLC (hereinafter referred to as "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff, VILLAGE OF FARMINGDALE (hereinafter referred to as "Plaintiff" or "Village"), is located in the Town of Oyster Bay, in Nassau County, New York.

4

2.      Plaintiff owns, operates and maintains supply wells for the purpose of providing

drinking water to the residents of its district. Groundwater is the sole source for those supply wells.

3.      Defendants are current owners and/or past or current operators of properties and/or

facilities (collectively "sites") that are upgradient of Plaintiff's supply wells.

4.      Defendants purchased, consumed, used, mixed, stored, handled and/or disposed of

the toxic chemical, 1,4-Dioxane and/or products containing 1,4-Dioxane at their sites and/or

caused and/or allowed 1,4-Dioxane to be discharged into the environment at their sites.

5.      Defendants failed to prevent and/or remediate the above discharges.

6.      As a direct and proximate result of Defendants' acts and omissions, 1,4-Dioxane

entered the groundwater and contaminated the aquifer from which Plaintiff draws potable water

for its customers.

7.      As a direct and proximate result of Defendants' acts and omissions, Plaintiff's water

supply wells have become contaminated with 1,4-Dioxane.

8.      Plaintiff seeks to recover damages caused by Defendants' contamination that

include, but are not limited to, investigation costs, testing costs, capital costs for the design and

installation of treatment, the operation and maintenance of the treatment system, infrastructure

modifications, engineering fees and other related costs and damages to Plaintiff's property.

## BACKGROUND ON 1,4-DIOXANE

9.      As used herein, the term "1,4-Dioxane" shall include its trade names, including but

not limited to Diethylene dioxide, Diethylene ether, Dioxan, and p-Dioxane.

10.     1,4-Dioxane is a highly toxic substance.  It is a synthetic industrial chemical that is

completely miscible in water. It has been used in many products, including paint strippers, dyes,

greases, varnishes, solvents and waxes. 1,4-Dioxane is also found as an impurity in antifreeze and

5

aircraft deicing fluids and in some consumer products, including deodorants, shampoos and cosmetics.

11.    1,4-Dioxane is used as a stabilizer for chlorinated solvents such as 1,1,1-Trichloroethane ("TCA"); a solvent for impregnating cellulose acetate membrane filters; a wetting and dispersing agent in textile processes; and a laboratory cryoscopic solvent for molecular mass determinations and Trichloroethylene ("TCE"), a degreaser for metal parts.

12.    1,4-Dioxane is short-lived in the atmosphere, but leaches readily from soil to groundwater, migrates rapidly in groundwater and is relatively resistant to biodegradation in the subsurface.

13.    1,4-Dioxane is classified by the U.S. Environmental Protection Agency ("EPA") as "likely to be carcinogenic to humans" by all routes of exposure. Short-term exposure may cause eye, nose and throat irritation and long-term exposure includes kidney and liver damage.

14.    1,4-Dioxane is included on the EPA's fourth drinking water contaminant candidate list and is included in the Third Unregulated Contaminant Monitoring Rule.[1]

15.    The Defendants knew, or should have known, that the distribution, purchase, transport, use, processing, mixture, storage, handling and/or disposal of 1,4-Dioxane and/or products containing 1,4-Dioxane  at their sites could create a substantial risk of harm to groundwater and members of the public who consume such groundwater.

16.    Nevertheless, Defendants negligently distributed, purchased, transported, used, processed, mixed, stored, handled and/or disposed of (directly or indirectly) 1,4-Dioxane and/or

---

[1] https://www.epa.gov/ccl/chemical-contaminants-ccl-4;
https://www.epa.gov/sites/production/files/2017-02/documents/ucmr3-data-summary-january-2017.pdf

products containing 1,4-Dioxane such that each Defendant knew or should have known that 1,4-Dioxane could be discharged into the soil, groundwater, and/or aquifer, and, therefore, Plaintiff's water supply wells.

17.     In 1978, the EPA designated the Long Island aquifer system as one of the first "sole source" aquifers in the country under the Safe Drinking Water Act, 42 U.S.C. § 300h-3(e). A "sole source aquifer" is "an aquifer which is the sole or principal drinking water source for the area and which, if contaminated, would create a significant hazard to public health." The EPA observed that "[s]ince contamination of a ground-water aquifer can be difficult or impossible to reverse, contamination of the aquifer system underlying Nassau and Suffolk Counties, New York, would pose a significant hazard to those people dependent on the aquifer system for drinking purposes."

18.     The EPA has no standard for 1,4-Dioxane and the default New York State Department of Health ("DOH") standard is 50 ppb.

19.     In early 2016, New York urged the EPA to acknowledge that 1,4-Dioxane contamination is a national problem that requires federal standards.

20.     On April 26, 2017, in response to growing public concern about drinking water pollution, Governor Cuomo signed the Clean Water Infrastructure Act, a $2.5 billion investment in drinking water infrastructure and water quality protection across the state.  The legislation requires all New York based water systems to test for 1,4-Dioxane contamination.

21.     An MCL is the maximum level of a contaminant allowed in public drinking water, which, once established, creates a legally enforceable standard that requires water systems to monitor, report findings and keep the contaminant below the level set. Exceedances must be reported to the public and require mitigation once detected.

7

22. On December 18, 2018 the New York State Drinking Water Quality Council recommended that the DOH adopt a first- in-the-nation MCL of 1.0 part per billion (ppb) for 1,4-Dioxane.

23. Acting on the above recommendation, the DOH has proposed amending 10 NYCRR Part 5 to establish an MCLs of 1.0 ppb for 1,4-Dioxane.

24. This MCL, which will apply to all public water suppliers, is expected to be adopted in the very near future in 2020.

## THE PARTIES

**Plaintiff:**

25. Plaintiff operates a public water system and has a duty to exercise due care and diligence in the maintenance and supervision of the public water system to prevent its pollution and depletion pursuant to 10 NYCRR § 5-1.71.

26. Plaintiff also has a duty to ensure the protection of public health pursuant to 10 NYCRR § 5-1.51.

27. In carrying out its powers, purposes and duties, Plaintiff acts in all respects for the benefit of the people of the Village of Farmingdale, for the protection of their health, welfare and prosperity.

28. Plaintiff functions as a full governing organization in charge of all operations and facilities within its juridical region. It maintains a Water Department that provides a public water supply to its residents. All water operations within the Village are carried out by the Water Department, which functions under the supervision of the Public Works Department.

29. Plaintiff supplies potable water as a self-sustaining entity to an estimated population of approximately 8,500 residents in an area about 1.1 square miles. Currently, Plaintiff distributes

8

water to approximately 2,135 clients through the use of 30.9 miles of water main. According to the 2008 Zip Code Business Patterns database, the Village population more than quadruples to about 35,000 people during normal work hours.

30.     Plaintiff obtains its entire water supply from groundwater sources by means of three (3) deep wells drilled into the Magothy Aquifer.

31.     The supply wells are located in two separate plant sites within Village boundaries. Well No. 1-3 is located at Plant No. 1 on Eastern Parkway, and Wells Nos. 2-2 and 2-3 are located at Plant No. 2 on Ridge Road.  The total approved capacity of the wells is 5.4 million gallons per day (MGD).

32.     In testing conducted in or about March 2017 and March 2018, the above wells showed 1,4-Dioxane levels close to EPA's screening standards.

33.     The March 2017 samples had 1,4-Dioxane levels of 0.21 µg/l at Well 1-3, 0.070 µg/l at Well 2-2 and 0.15 µg/l at Well 2-3.

34.     The March 2018 samples had higher levels of 1,4-Dioxane: 0.37 µg/l  at Well 1-3, 0.076 µg/l at Well 2-2 and 0.18 µg/l at Well 2-3.

35.     The concentrations of 1,4-Dioxane in these wells are expected to continue to rise over time, as the plumes migrating from Defendants' sites continue to impact Plaintiff's water supply.

36.     Plaintiff must take action to abate the imminent threat posed by the growing contamination of its wells.

37.     As a result of the presence of 1,4-Dioxane in Plaintiff's supply wells, Plaintiff has incurred and will incur costs, that it otherwise would not have to incur, to sample its water for 1,4-Dioxane for the next one hundred (100) years.

38.     As a result of the presence of 1,4-Dioxane in Plaintiff's supply wells, Plaintiff is

and will continue to incur significant costs for the investigation, planning, design, construction,

operation and maintenance of treatment systems to clean the water of the toxic and carcinogenic

chemicals used by Defendants.

39.     The State of New York has approved an effective new treatment technology for

1,4-Dioxane called Advanced Oxidative Process (AOP), which is already being utilized by the

Suffolk County Water Authority and other public water suppliers on Long Island.

40.     Plaintiff is considering installing the above technology at its plants, as well as other

mitigation measures to address 1,4-Dioxane contamination.

41.     As responsible parties, the Defendants, and not Plaintiff or its customers, should

bear these costs.

**Defendants**

42.     At all times relevant to this litigation, Defendants did business in New York as

consumers, users, handlers and/or disposers of 1,4-Dioxane and/or products containing 1,4-

Dioxane, and/or as owners and/or operators of sites at which synthetic industrial chemicals,

including but not limited to 1,4-Dioxane, have been discharged.

43.     At all times relevant to this litigation, Defendants were legally responsible and

committed each of the tortious and wrongful acts alleged in this Complaint.

44.     Any and all references to a Defendant or Defendants in this Complaint include any

and all predecessors, successors, parents, subsidiaries, affiliates and divisions of the named

defendants.

45.     When the term "Defendants" is used alone, it refers to all Defendants named herein

jointly and severally.

10

46.     When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

47.     Each of the Defendants did/does and/or solicited/solicits business within the State of New York.

48.     Each of the Defendants derived/derives substantial revenue from goods used or consumed or services rendered in the State of New York and expected or should have expected its acts and business activities to have consequences within the State of New York.

49.     Defendant **Sweet Hollow Realty Group, LLC** is a duly organized domestic corporation authorized to do business and transacting business in the State of New York.

50.     Defendant Sweet Hollow Realty Group, LLC is the current owner of the premises located at 161 Sweet Hollow Road, Old Bethpage, New York, part of the former Aluminum Louvre site.

51.     The site is approximately 3.36 acres in size and consists of two parcels with the addresses of 161 Bethpage-Sweet Hollow Road (approximately 2.14 acres) and 301 Winding Road (approximately 1.22 acres). The 301 Winding Road property was previously known as 310 Winding Road.

52.     Aluminum Louvre formerly owned 161 Bethpage-Sweet Hollow Road and also owned or leased the 301 Winding Road property, and simultaneously occupied both lots.

53.     Aluminum Louvre manufactured louvers on site, which involved the stamping, cutting, and shaping of metal stock and degreasing and painting.

11

54.     Nassau County records indicate that Aluminum Louvre used and stored various solvents, including TCA and TCE, from 1986-1994 and generated halogenated solvent waste and oily wastes during this time.

55.     In 1997, a contaminated drywell was remediated at 301 Winding Road, and in 1999-2000, a contaminated drywell was remediated at 161 Bethpage-Sweet Hollow Road, both as part of voluntary cleanup agreements.

56.     In 2007 -2009, elevated levels of TCE and TCA were detected in the soil, soil vapor and groundwater at both properties, and the properties were listed on New York State's Registry of Inactive Hazardous Waste Disposal Sites ("Superfund").

57.     In 2015, investigation of the groundwater downgradient of the site also revealed contamination with the above chemicals and their breakdown products.  For example, TCE was detected at a maximum concentration of 2,800 parts per billion (ppb), as compared to the New York State ambient water quality standard of 5 ppb.

58.     1,4-Dioxane is/was used as a solvent stabilizer for TCE and TCA.

59.     Upon information and belief, Aluminum Louvre introduced 1,4-Dioxane to the soil and groundwater at 161 Sweet Hollow Road and 301 Winding Road through its daily business activities, causing contamination of the underlying aquifer.

60.     Upon information and belief, Aluminum Louvre negligently stored, spilled, transported, and/or disposed of and/or willfully, wantonly, and intentionally spilled, disposed of, or otherwise released 1,4-Dioxane so as to cause a substantial groundwater plume to migrate off site, resulting in imminent, substantial and impending harm to Plaintiff.

61.     Upon information and belief, the groundwater plume containing 1,4-Dioxane that originated from the former Aluminum Louvre site has reached Village of Farmingdale Plant 1 and Plant 2, impacting all three (3) of the drinking water supply wells.

62.     At all times since it assumed ownership of the property at 161 Bethpage-Sweet Hollow Road, Sweet Hollow Realty Group, LLC knew or should have known of the contamination at the site and the threats to groundwater migrating from the site.

63.     At all times since it assumed ownership of the property at 161 Bethpage-Sweet Hollow Road, Sweet Hollow Realty Group, LLC has failed to take adequate action to prevent 1,4-Dioxane from continuing to migrate off-site and downgradient towards Plaintiffs' wells.

64.     At all times since it assumed ownership of the property at 161 Bethpage-Sweet Hollow Road, Sweet Hollow Realty Group, LLC has failed to remediate the off-site groundwater plume containing 1,4—Dioxane that has and is continuing to contaminate Plaintiffs' wells.

65.     Defendant **WDM LLC** is a duly organized domestic corporation authorized to do business and transacting business in the State of New York.

66.     Defendant WDM LLC is the current owner of the premises located at 301 Winding Road, Old Bethpage, part of the former Aluminum Louvre site.

67.     At all times since it assumed ownership of the property at 301 Winding Road, WDM LLC knew or should have known of the contamination at the site and the threats to groundwater migrating from the site.

68.     At all times since it assumed ownership of the property at 301 Winding Road, WDM LLC has failed to take adequate action to prevent 1,4-Dioxane from continuing to migrate off-site and downgradient towards Plaintiffs' wells.

13

69.     At all times since it assumed ownership of the property at 301 Winding Road, WDM LLC has failed to remediate the off-site groundwater plume containing 1,4—Dioxane that has and is continuing to contaminate Plaintiffs' wells.

70.     Defendant **Barchild Properties Limited Partnership** ("Barchild") is a corporation organized in the state of Michigan, with a principal place of business at 109 North Washington, Oxford, MI 48371.

71.     Defendant Barchild is registered to do business in New York and has an agent for service of process at 160 Sweet Hollow Rd., Old Bethpage, NY.

72.     Defendant Barchild is the current owner of the property located at 160 Sweet Hollow Rd., which is operated by Hitemco, LLC ("Hitemco").

73.     Hitemco, LLC specializes in engineered coatings that use metal substrates to create wear-resistant products ranging from aerospace to household applications.

74.     At all relevant times, Hitemco used TCE and other solvents in its manufacturing process and stored large amounts of TCE and waste TCE at the property at 160 Sweet Hollow Road.

75.     In 1999, both TCE and TCA were found in a drywell at the property.

76.     In 2008 and 2009, TCE was detected at elevated levels in groundwater monitoring wells and both TCE and TCA were detected in the soil vapor at the property.

77.     1,4-Dioxane is/was used as a solvent stabilizer for TCE and TCA.

78.     Upon information and belief, Hitemco introduced 1,4-Dioxane to the soil and groundwater at 160 Sweet Hollow Road through its daily business activities, causing contamination of the underlying aquifer.

14

79. Upon information and belief, Hitemco negligently stored, spilled, transported, and/or disposed of and/or willfully, wantonly, and intentionally spilled, disposed of or otherwise released 1,4-Dioxane so as to cause a substantial groundwater plume to migrate off site, resulting in imminent, substantial and impending harm to Plaintiff.

80. At all times since it assumed ownership of the property at 160 Sweet Hollow Road, Barchild knew or should have known of the contamination at the site and the threats to groundwater migrating from the site.

81. At all times since it assumed ownership of the property at 160 Sweet Hollow Road, Barchild has failed to take adequate action to prevent 1,4-Dioxane from continuing to migrate off-site and downgradient towards Plaintiffs' wells.

82. At all times since it assumed ownership of the property at 160 Sweet Hollow Road, Barchild has failed to remediate the off-site groundwater plume containing 1,4—Dioxane that has and is continuing to contaminate Plaintiffs' wells.

83. Defendant **148 Sweet Hollow Realty, LLC** was and is a duly organized domestic corporation authorized to do business and transacting business in the State of New York.

84. Defendant 148 Sweet Hollow Realty, LLC is the current owner of the premises located at 148 Bethpage-Sweet Hollow Road, Old Bethpage, NY.

85. In the 1970s, 1980s and early 1990s, the property was owned and occupied by Filtron Corporation ("Filtron"), a company that manufactured industrial filters.

86. As part of its operations, Filtron used and stored large amounts of TCA and TCE at the property.

87. In 1977, a County-wide survey reported that chemicals used by Filtron were disposed of by means of evaporation. In 1982, Filtron was issued a violation for storing chemicals

15

without a permit. It was noted that there were seven rusty drums on site, and spill procedures were not followed.

88. In 1992, Filtron sold the property to Trulite Louvre Corp. ("Trulite") a company that specializes in the manufacturing of lighting components.

89. Trulite reported that five-gallon buckets of cutting oil were stored in the building for use with the cutting machines. Trulite used approximately one bucket every two to three months. However, there is no waste stream of used cutting oil, as all parts are cleaned with TCE in a degreaser, creating one waste stream of spent TCE with cutting oil. Trulite had two drums of TCE on-site, one clean, and one spent. Trulite used approximately one 55-gallon drum of TCE every four to six months.

90. In 2007 and 2008, TCE was detected at elevated levels in groundwater monitoring wells at the property.

91. 1,4-Dioxane is/was used as a solvent stabilizer for TCE.

92. Upon information and belief, Filtron and Trulite introduced 1-4 Dioxane to the soil and groundwater 148 Bethpage-Sweet Hollow Road through their daily business activities, causing contamination of the underlying aquifer.

93. Upon information and belief, Filtron and Trulite negligently stored, spilled, transported, and/or disposed of and/or willfully, wantonly, and intentionally spilled, disposed of, or otherwise released 1,4-Dioxane so as to cause a substantial groundwater plume to migrate off site, resulting in imminent, substantial and impending harm to Plaintiff.

94. At all times since it assumed ownership of the property at 148 Sweet Hollow Road, 148 Sweet Hollow Realty, LLC knew or should have known of the contamination at the site and the threats to groundwater migrating from the site.

16

95.     At all times since it assumed ownership of the property at 148 Sweet Hollow Road,

148 Sweet Hollow Realty, LLC  has failed to take adequate action to prevent 1,4-Dioxane from

continuing to migrate off-site and downgradient towards Plaintiffs' wells.

96.     At all times since it assumed ownership of the property at 148 Sweet Hollow Road,

148 Sweet Hollow Realty, LLC  has failed to remediate the off-site groundwater plume containing

1,4—Dioxane that has and is continuing to contaminate Plaintiffs' wells.

97.     Defendants **937 Conklin Street Associates, LLC** and **965 Conklin Street

Associates, LLC** are duly organized domestic corporations authorized to do business and

transacting business in the State of New York.

98.     Defendants 937 Conklin Street Associates, LLC and 965 Conklin Street Associates

LLC are the current owners of the Brandt-Airflex site, located at 965 and 937 Conklin Street in

East Farmingdale, New York.

99.     Defendants 937 Conklin Street Associates, LLC and 965 Conklin Street Associates,

LLC purchased the two real properties operated by Airflex in 2006 from Frederick Fogelman, the

President of Brandt Airflex Corp.

100.    Mr. Fogelman is also the managing member of each of the defendant LLCs.

101.    On information and belief, the properties were previously owned by a related entity

called 937-941 Conklin Street Associates, starting from in or around 1984.

102.    According to a DEC records, Brandt-Airflex Corp. began leasing the property at

937 Conklin Street in 1976, and in 1980 it also began leasing 965 Conklin Street from Brent

Associates.   In 1984, Brent Associates sold the entire site to Conklin Street Associates, a

partnership formed by Frederick Fogelman, President of Brandt Airflex Corp., with Chares Selig.

17

Brandt Airflex Corp. and its successor and/or affiliated companies have occupied the property since 1976.

103.    On information and belief, Airflex Industrial Inc. (a/k/a Airflex Industries Inc.) and its parent company, Airflex Corp. (collectively, "Airflex") are the successors-in-interest to Brandt Airflex Corp.

104.    Airflex has leased and operated the site from on or about 1999 to the present.

105.    Airflex used and/or uses the buildings at 965 and 937 Conklin Street to manufacture metal products, including panels, floor vents, bar grilles, radiator covers, and custom plates.

106.    DEC records indicate that soil and groundwater on the Brandt-Airflex site was contaminated with industrial solvents, including PCE, TCE, DCE, and vinyl chloride (VC).

107.    In 1993 and 1994, Suffolk County officials discovered a highly contaminated drywell in the rear of the property 937 Conklin Street.  The drywell reportedly took in discharges from leaking drums and illegal paint spraying operations at the site, including at 965 Conklin Street. Groundwater samples downgradient of the drywell showed elevated levels of TCE and PCE.

108.    Although some of the contaminated soil around the drywell was excavated, contaminant concentrations in groundwater at the source area and downgradient remained high, indicating the 1994 cleanup was inadequate. Groundwater contaminant levels after the soil removal were as high as 13,000 ppb of trichloroethene (TCE) and 4,500 ppb of cis-1,2 dichloroethene (DCE) according to sampling conducted in 1995 and 1996.

109.    The properties at 937 and 965 Conklin Street are listed as a New York State Superfund site.

18

110.    A 2015 DEC Record of Decision documented continuing on and off-site groundwater contamination at the site.

111.    In 2019, 937 Conklin Street Associates, LLC and 965 Conklin Street Associates, LLC, Airflex Corp., and Airflex Industrial Inc. entered into an Order on Consent with the DEC to conduct remediation and pay past response costs related to contamination at the site.

112.    Upon information and belief, Brandt-Airflex and Airflex introduced 1-4 Dioxane to the soil and groundwater at 965 and 937 Conklin Street, through their daily business activities, causing contamination of the underlying aquifer.

113.    Upon information and belief, Brand-Airflex and Airflex negligently stored, spilled, spilled, transported, and/or disposed of and/or willfully, wantonly, and intentionally spilled, disposed of, or otherwise released the 1,4-Dioxane so as to cause a substantial groundwater plume to migrate off site, resulting in imminent, substantial and impending harm to Plaintiff.

114.    At all times since they and/or their related entities and/or Mr. Fogelman assumed ownership of the properties at 965 and 937 Conklin Street, 937 Conklin Street Associates, LLC and 965 Conklin Street Associates, LLC knew or should have known of the contamination at the site and the threats to groundwater migrating from the site.

115.    At all times since they and/or their related entities and/or Mr. Fogelman assumed ownership of the properties at 965 and 937 Conklin Street, 937 Conklin Street Associates, LLC and 965 Conklin Street Associates, LLC have failed to take adequate action to prevent 1,4-Dioxane from continuing to migrate off-site and downgradient towards Plaintiffs' wells.

116.    At all times since they and/or their related entities and/or Mr. Fogelman assumed ownership of the properties at 965 and 937 Conklin Street, 937 Conklin Street Associates, LLC

19

and 965 Conklin Street Associates, LLC have failed to remediate the off-site groundwater plume containing 1,4—Dioxane that has and is continuing to contaminate Plaintiffs' wells.

117.    Defendant **Aljo-Gefa Precision Manufacturing, LLC** ("Aljo-Gefa") was and is a duly organized domestic corporation authorized to do business and transacting business in the State of New York.

118.    Aljo-Gefa is the current operator of the former Life Industries Corporation, Inc. site at 205 Bethpage-Sweet Hollow Rd., Old Bethpage, New York.

119.    This property has been identified in prior environmental investigations as a potential source of downgradient groundwater contamination in the Old Bethpage Industrial Area because of operations using volatile organic chemicals, including chemicals containing 1,4-Dioxane.

120.    On information and belief, Aljo-Gefa is a successor in interest to Life Industries Corporation, Inc. ("Life Industries"), having purchased the site from it in or about 1995 or 1999.

121.    On information and belief, Aljo-Gefa manufactures aircraft components out of aluminum, steel, and titanium. Cutting and polishing is done on-site.   Soluble oils are used in the cutting process. Mixed coolant, lubricating oil and hydraulic oil is used and stored on site.

122.    Life Industries also used solvents in its operations at the property.

123.    In 2010, as part of the DEC's investigation into potential sources of groundwater contamination in the Old Bethpage Industrial Area, its contractor, Malcolm Pirnie, conducted testing at this site.   The results, summarized in the Site Characterization Report: Old Bethpage Industrial Area Plume Trackdown, showed that PCE and TCE in groundwater exceeded allowable safety standards. In addition, elevated levels of TCA and TCE were found in the soil vapor points at the property.

124.    Upon information and belief, Aljo-Gefa and Life Industries introduced 1, 4 - Dioxane to the soil and/or groundwater located underneath their facilities, through their daily business activities, causing contamination of the underlying aquifer.

125.    Upon information and belief, Aljo-Gefa and Life Industries negligently stored, spilled, transported, and/or disposed of and/or willfully, wantonly, and intentionally spilled, disposed of, or otherwise released 1,4-Dioxane so as to cause a substantial groundwater plume to migrate off site, resulting in imminent, substantial and impending harm to Plaintiff.

126.    Defendant **Sweet Hollow Associates LLC** is a duly organized domestic corporation authorized to do business and transacting business in the State of New York.

127.    Defendant Sweet Hollow Associates LLC is the current owner of the former Life Industries site located at 205 Bethpage-Sweet Hollow Road, Old Bethpage, NY.

128.    At all times since it assumed ownership of the property at 205 Bethpage-Sweet Hollow Road, Sweet Hollow Associates LLC knew or should have known of the contamination at the site and the threats to groundwater migrating from the site.

129.    At all times since it assumed ownership of the property at 205 Bethpage-Sweet Hollow Road, Sweet Hollow Associates LLC has failed to take adequate action to prevent 1,4-Dioxane from continuing to migrate off-site and downgradient towards Plaintiffs' wells.

130.    At all times since it assumed ownership of the property at 205 Bethpage-Sweet Hollow Road, Sweet Hollow Associates LLC has failed to remediate the off-site groundwater plume containing 1,4—Dioxane that has and is continuing to contaminate Plaintiffs' wells.

131.    **Defendant Far East 668 Properties LLC** is a duly organized domestic corporation authorized to do business and transacting business in the State of New York.

21

132.    Defendant Far East 668 Properties LLC is the current owner of the former Dyna Force site located at 195 Bethpage-Sweet Hollow Rd., Old Bethpage, NY.

133.    This property has been identified in prior environmental investigations as a potential source of downgradient groundwater contamination in the Old Bethpage Industrial Area because of Dyna Force's operations using volatile organic chemicals, including TCA.

134.    Upon information and belief, Dyna Force Inc. (aka Dynaforce Corporation and/or Dynaforce West Corporation) ("Dyna Force") introduced 1,4-Dioxane to the soil and/or groundwater at 195 Bethpage-Sweet Hollow Rd, through its daily business activities, causing contamination of the underlying aquifer.

135.    Upon information and belief, Dyna Force negligently stored, spilled, transported, and/or disposed of and/or willfully, wantonly, and intentionally spilled, disposed of, or otherwise released 1,4-Dioxane so as to cause a substantial groundwater plume to migrate off site, resulting in imminent, substantial and impending harm to Plaintiff.

136.    In 2010, the property was tested as part of the DEC's investigation into potential sources of groundwater contamination in the Old Bethpage Industrial Area.  Elevated levels of several volatile organic chemicals, including DCE, PCE, TCA and TCE were detected in the soil vapor at the site.

137.    At all times since it assumed ownership of the property at 195 Bethpage-Sweet Hollow Rd, Far East 668 Properties LLC knew or should have known of the contamination at the site and the threats to groundwater migrating from the site.

138.    At all times since it assumed ownership of the property at 195 Bethpage-Sweet Hollow Rd, Far East 668 Properties LLC  has failed to take adequate action to prevent 1,4-Dioxane from continuing to migrate off-site and downgradient towards Plaintiffs' wells.

139.     At all times since it assumed ownership of the property at 195 Bethpage-Sweet Hollow Rd, Far East 668 Properties LLC has failed to remediate the off-site groundwater plume containing 1,4—Dioxane that has and is continuing to contaminate Plaintiffs' wells.

140.     Defendant **Gonzalez Chemical Corp.** is a duly organized domestic corporation authorized to do business and transacting business in the State of New York.

141.     Defendant Gonzalez Chemical Corp. formerly operated under the name of Captree Chemical Corp. ("Captree") at the property located at 445 Winding Road, Old Bethpage, NY ("former Captree site").

142.     The former Captree site has been identified in prior environmental investigations as a potential source of downgradient groundwater contamination in the Old Bethpage Industrial Area because of Captree's use of volatile organic chemicals in its operations.

143.     In April 1998, PCE, TCE, 1,1,1-TCA, 1,1,2-TCA, methylene chloride, benzene, ethylbenzene, and toluene were detected in the groundwater samples collected from the monitoring wells and/or dry wells at this site.

144.     1,4-Dioxane is/was used as a solvent stabilizer for TCE and TCA.

145.     Upon information and belief, Captree introduced 1, 4 -Dioxane to the soil and/or groundwater at 445 Winding Road through its daily business activities, causing contamination of the underlying aquifer.

146.     Upon information and belief, Captree negligently stored, spilled, transported, and/or disposed of and/or willfully, wantonly, and intentionally spilled, disposed of, or otherwise released 1,4-Dioxane so as to cause a substantial groundwater plume to migrate off site, resulting in imminent, substantial and impending harm to Plaintiff.

23

147.    Upon information and belief, Defendant Gonzalez Chemical Corp., operating under the name of Captree at the site, caused Plaintiff's damages.

148.    Defendant **Mays Chemical Company Inc**. is a foreign corporation organized in the state of Indiana, with a principal place of business at 5611 71st St., Indianapolis, IN 46220.

149.    Upon information and belief, Mays Chemical Company Inc. and/or its affiliate Mays-Captree, LLC, purchased the assets of Captree in 2002.  Mays-Captree, LLC was formed in 2002 and dissolved in 2009.

150.    Upon information and belief, Mays Chemical Company Inc, individually and as successor in interest to Captree, introduced 1, 4 -Dioxane to the soil and/or groundwater at 445 Winding Road through its daily business activities, causing contamination of the underlying aquifer.

151.    Upon information and belief, Mays Chemical Company Inc, individually and as successor in interest to Captree, negligently stored, spilled, transported, and/or disposed of and/or willfully, wantonly, and intentionally spilled, disposed of, or otherwise released 1,4-Dioxane so as to cause a substantial groundwater plume to migrate off site, resulting in imminent, substantial and impending harm to Plaintiff.

152.    Defendant **Quarter to Five, Inc.** is a duly organized domestic corporation authorized to do business and transacting business in the State of New York.

153.    Defendant Quarter to Five, Inc. is the current owner of the former Captree site.

154.    At all times since it assumed ownership of the property at 445 Winding Road, Quarter to Five, Inc. knew or should have known of the contamination at the site and the threats to groundwater migrating from the site.

24

155.    At all times since it assumed ownership of the property at 445 Winding Road, Quarter to Five, Inc. has failed to take adequate action to prevent 1,4-Dioxane from continuing to migrate off-site and downgradient towards Plaintiffs' wells.

156.    At all times since it assumed ownership of the property at 445 Winding Road, Quarter to Five, Inc. has failed to remediate the off-site groundwater plume containing 1,4-Dioxane that has and is continuing to contaminate Plaintiffs' wells.

157.    Defendant **Old Beth II, LLC** is a duly organized domestic corporation authorized to do business and transacting business in the State of New York.

158.    Defendant Old Beth II, LLC is the current owner of the former Claremont Polychemical site located at 501 Winding Road, Old Bethpage, NY.

159.    The site was formerly operated by Claremont Polychemical Corp. ("Claremont") which manufactured pigments for plastics, inks, coated metallic flakes, and vinyl stabilizers. Organic solvents, resins and wash wastes (mineral spirits) were the principal wastes generated.

160.    Between 2,000 and 3,000 drums were removed from the site in 1979-1980 after discovery by the Nassau County Department of Health. Soil was found to be contaminated to depths of at least 10 feet and groundwater contamination is evident.

161.    Volatile organic compounds (1,1-dichloroethane, tetrachloroethene, trans-1,2-dichloroethene, 1,1,1-trichloroethene and trichloroethene) were also detected in the groundwater above state MCLs.

162.    The Claremont site is listed as a New York State Superfund Site.

163.    Upon information and belief, Claremont introduced 1, 4 -Dioxane to the soil and/or groundwater 501 Winding Road through its daily business activities, causing contamination of the underlying aquifer.

164. Upon information and belief, Claremont negligently stored, spilled, transported, and/or disposed of and/or willfully, wantonly, and intentionally spilled, disposed of, or otherwise released 1,4-Dioxane so as to cause a substantial groundwater plume to migrate off site, resulting in imminent, substantial and impending harm to Plaintiff.

165. At all times since it assumed ownership of the property at 501 Winding Road, Old Beth II, LLC knew or should have known of the contamination at the site and the threats to groundwater migrating from the site.

166. At all times since it assumed ownership of the property at 501 Winding Road, Old Beth II, LLC has failed to take adequate action to prevent 1,4-Dioxane from continuing to migrate off-site and downgradient towards Plaintiffs' wells.

167. At all times since it assumed ownership of the property at 501 Winding Road, Old Beth II, LLC has failed to remediate the off-site groundwater plume containing 1,4—Dioxane that has and is continuing to contaminate Plaintiffs' wells.

## JURISDICTION AND VENUE

168. This case is properly venued in this Court pursuant to CPLR §§ 503(a)and (c) due to the residence of Plaintiff and Defendants and the place where the cause of action arose, and pursuant to CPLR § 507 because the judgment demanded would affect the possession, use or enjoyment of real property situated in the County of Nassau.

169. This Court has personal jurisdiction over Defendants as each of them are or were doing business in New York and/or owned or own property in New York, such that it is reasonably foreseeable that they would be subject to the jurisdiction of the courts of this State.

### FIRST CAUSE OF ACTION:
### NEGLIGENCE

170.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

171.    Defendants negligently breached their duties to Plaintiff to ensure that activities and operations at their facilities and/or properties would not contaminate the groundwater, the aquifer and Plaintiffs' water supply wells.

172.    Defendants negligently breached their duties to Plaintiff to fully and timely remediate the contaminated groundwater migrating from their facilities and/or properties before it threatened and/or actually impacted Plaintiff's water supply wells.

173.    Defendants are continuing to contribute to the presence of 1,4-Dioxane in Plaintiff's wells by failing to fully remediate the contaminated groundwater coming from their facilities and/or properties.

174.    Defendants breached their duty by failing to timely notify Plaintiff of any releases of 1,4-Dioxane into the environment at their facilities and/or properties, and consequently, in the vicinity of Plaintiff's drinking water production wells.

175.    As a result of Defendants' breaches of their duty to timely notify the Plaintiff, Plaintiff was forestalled from undertaking effective and immediate remedial measures to mitigate the harm.

176.    Defendants' past, present and continuing breaches of their duties, as described above, are the direct, sole and proximate cause of Plaintiff's damages and present imminent, substantial and impending harm to Plaintiff.

177.    Plaintiff has expended and/or will be forced to expend significant resources to test, monitor, treat and remediate the effects of Defendants' negligence for many years into the future.

178. Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

179. As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial. Upon information and belief, said amount exceeds the jurisdictional limits of the lower courts.

**SECOND CAUSE OF ACTION**
**TRESPASS**

180. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

181. Plaintiff owns and possesses its drinking water production system, including drinking water production wells that extract groundwater in Nassau County, New York.

182. Plaintiff actually and actively exercises its rights to appropriate and use groundwater drawn from its wells.

183. Plaintiff did not give any Defendant permission to release 1,4-Dioxane and for it to enter its drinking water supply wells.

184. Defendants knew or reasonably have known that the 1,4-Dioxane has a propensity to infiltrate groundwater aquifers when released to the environment; is mobile and persistent in groundwater; is capable of moving substantial distances within aquifers; is toxic to human health; and is therefore hazardous to drinking water systems and human health.

185. Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused and/or allowed 1,4-Dioxane to be spilled, disposed of, or otherwise released into the ground, soil, groundwater, and aquifer, contaminating Plaintiff's wells.

186. Defendants' conduct constitutes a continuing unauthorized intrusion and a continuing trespass onto Plaintiff's property.

187.    Defendants' willful, wanton, and intentional failure to act and/or their affirmative choice of action and following course of action caused 1,4-Dioxane to enter and trespass upon the land and realty of the Plaintiff and cause an injury to Plaintiff's possession and/or right of possession.

188.    Each Defendant was/is a substantial factor in bringing about the contamination of Plaintiff's wells, and each Defendant aided and abetted the trespasses and is jointly responsible for the injuries and damage caused to Plaintiff.

189.    Defendants' voluntary actions resulted and will continue to result in the immediate and continued trespass, injury and damage to Plaintiff, its public supply wells and its right to clean, uncontaminated drinking water for its customers.

190.    At the time that the above described affirmative, voluntary, and intentional acts were performed, Defendants had good reason to know or expect that the 1,4-Dioxane release at their facilities and/or properties would pass through the soil, groundwater, and aquifer into Plaintiff's supply wells.

191.    Defendants' actions in disposing and/or permitting the disposal of 1,4-Dioxane into the ground were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiff's and Plaintiff's customers' rights, health and property.

192.    Defendants' failures to take effective and appropriate action to eliminate and/or remedy the 1,4-Dioxane contamination of the soil, groundwater, and aquifer at their facilities and/or properties, including contaminated groundwater flowing downgradient, were intentional and/or reckless and/or done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiff's and Plaintiff's customers' rights, health and property.

193.    Further, Defendants' remedial actions, if any, were patently insufficient to eliminate and/or remedy the contamination, showing actual malice and wanton and willful and/or reckless disregard for Plaintiff's rights and property.

194.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

195.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial. Upon information and belief, said amount exceeds the jurisdictional limits of all of the lower courts.

### THIRD CAUSE OF ACTION:
### PUBLIC NUISANCE

196.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

197.    Plaintiff provides drinking water from its impacted wells in Nassau County to a large number of residents and businesses for drinking, bathing, cleaning, washing, and other uses.

198.    Because the Village is a public entity, the water it provides to those residents and business is a public or commonly held resource. Members of the public have a right to have their water remain clean and potable, free of contamination by toxic man-made compounds.

199.    Defendants have caused and/or allowed 1,4-Dioxane to be spilled, disposed of, or otherwise released into the soil, and groundwater at their facilities and/or properties, contaminating the aquifer and Plaintiff's wells.

200.    Defendants, by their negligent, reckless and willful acts and omissions set forth above, have, among other things, unleashed massive, long-lasting and still spreading toxic contamination of the groundwater with 1,4-Dioxane. This contamination has migrated into the

aquifer from which Plaintiff draws its water. As a result, all wells belonging to the Plaintiff have been contaminated.

201.     Defendant have and continue to violate and/or endanger the public right to pure drinking water, as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater.

202.     Defendants have and continue to endanger or injure the property, health, safety and/or comfort of a considerable number of persons.

203.     Defendants have and continue to endanger or injure the health, safety and comfort of the general public and the property of Plaintiff, causing inconvenience and annoyance.

204.     The contamination caused by 1,4-Dioxane is both real and immediate and constitutes a current existing, as well as prospective, public nuisance.

205.     As an owner of water production wells and a purveyor of drinking water, Plaintiff suffers injuries different in kind from the community at large precisely because it relies upon groundwater and production wells for its functions.

206.     Whereas many New York residents rely on water drawn from surface water sources that are not susceptible to the problems caused by the 1,4-Dioxane in groundwater, Plaintiff's production wells are entirely dependent upon groundwater.

207.     Defendants knew or, in the exercise of reasonable care, should have known that the release of the 1,4-Dioxane into the subsurface would unreasonably and seriously caused damage, endanger, injure and interfer with the ordinary comfort, use and enjoyment of vital groundwater resources relied upon by Plaintiff and the public.

208.     As a direct and proximate result of Defendants' acts and omissions created the above-described nuisance, Plaintiff has and continues to suffer injuries common to the public at

large and additional special injuries from actual and threatened contamination of groundwater supplying Plaintiff's production wells.

209.   Plaintiff's special injuries include: investigative costs, additional testing and monitoring costs, treatment costs, attorney fees and costs, and loss of water production capacity and loss of consumer confidence arising out of the increasingly widespread public perception - based on actual fact - that the underground aquifers, groundwater and wells have been rendered less certain, safe and reliable than the other sources of water.

210.   Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

211.   As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial. Upon information and belief, said amount exceeds the jurisdictional limits of all of the lower courts.

**PUNITIVE DAMAGES**

212.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

213.   The conduct of the Defendants, including but not limited to:

a.   issuing no warnings and failing to divulge material information concerning the release of 1,4-Dioxane and/or products containing 1,4-Dioxane into soil and groundwater, including into Plaintiff's drinking water supply; and

b.   knowing of the certainty of long-lasting water contamination, including specifically high risks to aquifers, groundwater and production areas, from disposing of solvents containing 1,4-Dioxane in soil or groundwater and knowingly doing so and/or permitting such disposal, causing great harm to Plaintiff, demonstrating an outrageous

conscious disregard of Plaintiff's customers' safety with implied malice and oppression for which punitive and exemplary damages should be imposed.

c. knowing about the groundwater contamination with solvents, including solvents containing 1,4-Dioxane, migrating from their facilities and/or properties, but deliberately and/or recklessly failing to take adequate and timely action to remediate such contamination to prevent, mitigate, and/or stop the impact on Plaintiff, its property, and its customers.

## **PRAYER FOR RELIEF**

**WHEREFORE,** the Plaintiff prays for a judgment against these Defendants for:

214. Compensatory damages in an amount to be demonstrated and proven at trial but which is:

   a. Fifty Million Dollars ($50,000,000) on the First Cause of Action;

   b. Fifty Million Dollars ($50,000,000) on the Second Cause of Action;

   c. Fifty Million Dollars ($50,000,000) on the Third Cause of Action;

215. Punitive damages as a result of Defendants' above-described conduct in the amount of:

   a. One Hundred Million ($100,000,000) on the First Cause of Action;

   b. One Hundred Million ($100,000,000) on the Second Cause of Action;

   c. One Hundred Million ($100,000,000) on the Third Cause of Action;

216. Reasonable fees for attorneys;

217. Costs and disbursements of this lawsuit;

218. Interest on the damages according to law; and

219. Any other and further relief as the Court deems just, proper and equitable.

220.    Plaintiff is not asking for any equitable or injunctive relief, but compensatory

damages only.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

Dated: Melville, New York
July 27, 2020

Respectfully submitted,

**NAPOLI SHKOLNIK PLLC**

_____
Lilia Factor, Esq.
Paul J. Napoli, Esq.
Patrick J. Lanciotti, Esq.
400 Broadhollow Road, Suite 305
Melville, New York 11747
Tel: (212) 397-1000
Fax: (646) 843-7603

34

## VERIFICATION

I, LILIA FACTOR, am an attorney duly admitted to practice law in the Courts of this State, and I affirm the following under penalties of perjury:

I am the attorney for the Plaintiff in the above entitled action. I have read the foregoing **SUMMONS & VERIFIED COMPLAINT** and know the contents thereof, and upon information and belief, affirmant believes after an inquiry reasonable under the circumstances, the matters alleged herein to be true, and that the contentions herein are not frivolous, as that term is defined in 22 NYCRR § 130-1.1(c).

The reason this verification is made by affirmant and not by Plaintiff is that the Plaintiff herein reside in a County other than the County in which I maintain my offices.

The source of affirmant's information and the grounds of his/her belief are communications, papers, reports and investigations contained in the file maintained by this office.

Dated: Melville, New York
       July 27, 2020

_____
Lilia Factor

35